## CECIL B. DE MILLE PRODUCTIONS, Inc., v. WOOLERY et al.*
### No. 6679.

Circuit Court of Appeals, Ninth Circuit.

Aug. 29, 1932.

*Rehearing denied November 14, 1932.

Neil S. McCarthy, Earl L. Banta, and Howard P. Hall, all of Los Angeles, Cal., for appellant.

Ivan G. McDaniel, Franklin W. Peck, and Spencer Austrian, all of Los Angeles, Cal., for appellees Cornish and other creditors.

Walter J. Little and W. Eugene Craven, both of Los Angeles, Cal., for appellees North and Kelly.

Before WILBUR and SAWTELLE, Circuit Judges, and ST. SURE, District Judge.

SAWTELLE, Circuit Judge.

This is a proceeding wherein Cecil B. De Mille Productions, Inc., the appellant herein, petitioned the United States District Court, for the Southern District of California, Central Division, for an order directing Mark D. Woolery, receiver for Del Rey Oil & Refining Company, Limited, to show cause why he should not pay to the petitioner the sum of $21,371.09, together with 45 per cent. of all sums due for oil, gas and other hydrocarbon substances produced and sold to the said receiver under contracts between the Elmer Company, Limited, and the Del Rey Company.

The petition shows that prior to the time that the Del Rey Company went into the hands of a receiver, the Elmer Company had made contracts with the Del Rey for the sale of oil produced on certain leases and from certain property involved in this proceeding. The receiver continued under said contracts and, according to a stipulation of the parties, was indebted to the Elmer Company, at the time of the filing of the petition, in the sum of $20,320.13.

The petitioner claimed said moneys by reason of certain assignments made by the Elmer Company to the De Mille Company, of "a gross overriding royalty interest equal to" a certain per cent. "of the gross proceeds received from the sale of oil produced" from certain land.

The Elmer Company secured a permit from the Corporation Commissioner of the State of California authorizing the transfer of said oil and gas royalty interests equal to 5 per cent., but failed and neglected to secure a permit for the assignment of oil and gas royalty interests equal to 40 per cent. of the oil and gas produced from the Venice wells.

The appellant lent the sum of $50,000 to the Elmer Company on each of the following dates: July 3, 1930, August 13, 1930, and November 6, 1930. Each $50,000 loan was evidenced by a promissory note. The first note was paid, and it is agreed that of the two other notes there remained unpaid a total of approximately $81,000. There is no doubt that the appellants are general creditors of the Elmer Company to the extent of that unpaid balance.

Each of the two notes in question contains a promise to pay to the appellant the sum of $50,000, ninety days after demand in the case of one note, and sixty days in the case of the other note. It also sets forth that in consideration of the making of the loan, the Elmer Company agrees to "execute and deliver to the payee" "in the form acceptable to the payee, a gross overriding royalty of five per cent (5%) of all oil, gas and other hydro-carbon substances produced, saved and sold from any part of the premises hereinabove described, it being stipulated and agreed that it is uncertain as to whether or not said royalty interest will have any value whatsoever, it being unknown whether oil will be produced and impossible to ascertain the quality and quantity of oil that will be produced in the event wells are brought in."

"As collateral security" for each note, the Elmer Company "deposits and pledges" certain property, including "a gross [net] overriding royalty interest of forty per cent (40%) of the gross proceeds received from the sale of any and all oil and gas and other hydro-carbon substances produced, saved and sold." The second note describes this overriding royalty interest as "gross," and the third note as "net." Both state, however, that it is to be "of the gross proceeds."

Each note recites that the consideration therefor is $50,000, and the Elmer Company agrees that the money shall be used for no other purpose than for the drilling of two wells in Venice, Cal.

Each note provides that all income that shall accrue from "the overriding royalty of forty per cent" "shall be applied to reduce the principal" of the note.

The various appellees do not seem to agree in their views regarding the promissory notes themselves. The receivers of the Elmer Company assert in their brief: "No other inference can be drawn from the entire transaction than that this is one of the situations that the Corporate Securities Act was promulgated to guard against, and that the promissory notes were not issued in 'a bona fide way in the ordinary course of legitimate business, trade or commerce.' * * * There is no difference between the two sections as to their intent, namely, that all promissory notes, secured or otherwise, are invalid except when issued by and with the consent of the Commissioner of Corporations, or unless they are issued in the ordinary course of legitimate business. The phrase 'in the ordinary course of legitimate business' means those notes which are ordinarily accepted in such amounts by responsible business houses as are within the credit limitation of the maker. The words 'bona fide' in section 2 (b) (10) certainly mean that such notes shall be given without intent to deceive either the payee or the creditors of the maker, or any person interested in the business of the maker. To our mind, no such situation exists here. Every effort appears to have been made to withhold from the Commissioner of Corporations information which he should have had before him. If all the facts as we have assumed them to be were before him, and his permit was granted without specific mention of the promissory notes, then the issuance of the notes by the Elmer Company, Ltd., without that specific mention and permit, was illegal and the notes would be and they are invalid."

The creditors, on the other hand, state in their brief that "no contention is made in the present case that the promissory note executed by the Elmer Company is a security; on the contrary, it is our position that the right hypothecated to secure the promissory note is the security, not the note itself."

The lower court handed down a conclusion of law that all three promissory notes "so far as they purport to assign a 50% and 40% overriding royalty, respectively, are void" for lack of a permit. We concur with this conclusion, but desire to emphasize that an ordinary promissory note, whether secured or unsecured, not offered to the public or sold to an underwriter for the purpose of resale, is not such a security as to require a permit under the Corporate Securities Act of California. See section 2 (b) (11) of the act, as amended in 1929 (St. 1929, p. 1251, § 1).

Two other contracts under attack herein, as issued without the requisite permits from the Corporation Commissioner, are Exhibits E and H, each of which purports to assign to the appellant a "gross overriding interest equal," in one case, to 50 per cent "of the *net* proceeds received from the sale of any and all oil, gas and other hydro-carbon substances that may be produced, saved or sold," etc., and in the other assignment, "equal to forty per cent" "of the *gross* proceeds received" from such sale.

The lower court concluded that each of the royalty assignments of 40 or 50 per cent. was void, for the reason stated above, namely, that it was a security and was issued

without a permit from the Corporation Commissioner.

Finally, there remain to be considered Exhibits J and K. Exhibit J is a letter addressed to the Del Rey Company by the Elmer Company, notifying the former that the latter has |"heretofore sold, assigned and transferred" to the De Mille Company "five per cent of the proceeds received from the sale of any and all oil," etc., and also specifically referring to "all moneys due or that may become due to the Elmer Company by reason of the sale of oil, gas or other hydrocarbon substances by the Elmer Company" to the Del Rey Company, from the Venice oil field.

While the appellees include Exhibit J as one of the contracts the validity of which constitutes "the only question before this Court," this is clearly erroneous, for the lower court concluded that "Exhibit J, so far as it purports to ratify these assignments [of five per cent] is likewise validly issued." No cross-appeal from this finding has been taken; and, in view of the fact that Exhibit J does clearly purport to cover the assignments for which, as we have seen, a proper permit was secured, we approve of the finding of the lower court.

Exhibit K similarly purports to ratify the assignments of 40 per cent., for which, however, no permit was obtained. It also is a letter from the Elmer Company to the Del Rey Company, notifying the latter that the former has transferred to the appellant specifically "forty per cent (40%) of all moneys due or that may become due to the Elmer Company, Ltd., by reason of the sale of oil, gas," etc., by the Elmer Company to the Del Rey Company, from the Venice field.

Counsel for the appellant seek to differentiate this assignment, Exhibit K, from the other two assignments of 40 per cent. royalty interests. The lower court handed down as a conclusion of law the view that Exhibits J and K "do not constitute separate assignments, either equitable or otherwise, of the funds in the hand of the Del Rey Oil & Refining Co., Ltd., but were given as and intended to be directions or orders for the payment of funds and as a ratification of previous assignments already made." A study of the contracts themselves will reveal that the court was correct in this conclusion. All the 40 per cent. assignments must stand or fall together. It is stipulated and admitted that these assignments were not authorized by a permit from the Corporation Commis-

sioner. Although the stipulation is silent as to the promissory notes, clearly if the separate assignments of 40 per cent. royalties were invalid for want of a permit, the promissory notes containing such assignments likewise, pro tanto, came within the purview of the Securities Act.

The court below entered orders that the receiver of the Del Rey Company forthwith pay to the receivers of the Elmer Company all moneys received by him for hydrocarbon substances up to and including February, 1931, save and except the 5 per cent. royalties hereinabove mentioned, which are to be paid to the De Mille Company. It was further ordered that from and after February, 1931, only 5 per cent. of the proceeds of such products be delivered by the receivers of the Elmer Company to the receiver of the Del Rey Company for redelivery to the De Mille Company, the balance, "if any," to be paid to the receivers of the Elmer Company. From these orders the De Mille Company is bringing this appeal.

The sole question presented herein is whether or not the 40 per cent. and 50 per cent. royalty assignments were securities within the meaning of the Corporate Securities Act, and required for their issuance a permit from the Corporation Commissioner.

At the threshold of our inquiry, we are met by the appellant's objection that even if the assignments are void, the receivers of the Elmer Company cannot raise that question. The appellant asserts that "the issuer of the royalty interests, to-wit: the Elmer Company, Ltd., under the decisions, had no right to set up the invalidity of these transfers, inasmuch as the petitioner, Cecil B. De Mille Productions, Inc., was not in pari delicto; and the receivers of the Elmer Company, Ltd., being in no better position than the Elmer Company, Ltd., could not set up the invalidity to defeat the claim of the petitioner."

We believe that the appellant is in error in both of these contentions.

Section 12 of the act (St. 1917, p. 679), provides: "Every security issued by any company, without a permit of the commissioner authorizing the same then in effect, shall be void. * * * "

In California, "it is settled that an act or contract in violation of such a law [one making a violation thereof a felony] is void, not voidable, and if the party not in pari delicto is entitled to any relief, he may have

restitution only." 6A Cal. Jur. § 314, p. 561.

In Tatterson et al. v. Kehrlein et al., 88 Cal. App. 34, 48, 49, 263 P. 285, 290, petition for hearing denied by the Supreme Court of California, the court said: "The Corporate Securities Act was passed for the protection of the public and 'every case from every court recognizes that when a statute has been made for the protection of the public a contract in violation of its provisions is void.' Payne v. DeVaughn, 77 Cal. App. 399, 403, 246 P. 1069, 1071. * * * 'This is one of the distinctions between void and voidable contracts. The doctrines of estoppel by contract and ratification have no application to a contract which is void because it violates an express mandate of the law or the dictates of public policy. Such a contract has no legal existence for any purpose and neither action nor inaction of a party to it can validate it and no conduct of a party to it can be invoked as an estoppel against asserting its invalidity.' [Cases cited.]"

In Colby v. Title Insurance & Trust Company et al., 160 Cal. 632, 644, 117 P. 913, 918, 35 L. R. A. (N. S.) 813, Ann. Cas. 1913A, 515, the Supreme Court of California used the following language: "But the doctrine of estoppel by conduct or by laches, or even ratification, has no application to a contract or instrument which is void because it violates an express mandate of the law or the dictates of public policy. Such a contract has no existence whatever. It has no legal entity for any purpose, and neither action nor inaction of a party to it can validate it; and no conduct of a party to it can be invoked as an estoppel against asserting its invalidity. The authorities are uniformly agreed on this principle, and the following cases, out of a number, are selected on this point, because they involve contracts which, like the instruments alleged by plaintiff to have been executed for an illegal consideration, were declared void as against public policy, and where it was held that the plea of estoppel as against such contracts could not be asserted. [Many cases cited.]"

See, also, Reno v. American Ice Machine Company, 72 Cal. App. 409, 413, 237 P. 784, petition for hearing in the Supreme Court of California denied.

In Black v. Solano Co. et al., 114 Cal. App. 170, 299 P. 843, 846, the rule as to the effect of invalidity was thus stated: "If plaintiff bought a security, within the meaning of the act, and it was issued without a permit, if required by the act, the eyes of the law see it as a blank piece of paper, giving plaintiff no right to any oil."

The appellant asserts that "the Corporate Securities Act was enacted to protect buyers or persons who receive securities." But the buyer is not the only person that may have the protection of the act. "It seeks to protect the public, as well as to safeguard the individual purchasers or subscribers and creditors." 6A Cal. Jur., § 300, p. 532.

In People v. Kuder et al., 98 Cal. App. 206, 216, 217, 276 P. 578, 583, the court said: "The purpose of the Corporate Securities Act is to shield the purchasing stockholder from fraud, and to protect merchants and tradesmen who may deal with the corporation from loss through extended credit."

And the receivers represent the creditors. In Jacobson, etc., v. Allen, etc., and others (C. C.) 12 F. 454, 456, 457, the court said: "The receiver of an insolvent corporation makes his title through the corporation. He cannot through his appointment acquire that which the corporation never had. He represents the creditors of the corporation in the administration of his trust, but his trust relates only to the corporate assets. As trustee for creditors he represents them in following the assets of the corporation, and can assert their rights in cases where the corporation could not have been heard."

See, also, Clark on Receivers, § 573, p. 778. We believe that the receivers and the creditors of the corporation at least could assert the invalidity of these securities under the act of 1929.

Adverting to the main question in this case—namely, whether or not these assignments of 40 per cent. are such securities as to require for their issuance a permit from the Corporation Commission of California —we find guidance from several sections of the Corporate Securities Act:

"Sec. 2 (a) * * * 7. The word 'security' shall include any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation, certificate of interest in a profit-sharing agreement, certificate of interest in an oil, gas or mining lease, collateral trust certificate, preorganization certificate, preorganization subscription, any transferable share, investment contract, or beneficial interest in title to property, profits or earnings or any other instrument commonly known as a security."

"Sec. 2 (b) Except as hereinafter otherwise expressly provided, the provisions of this act shall not apply to any of the following classes of securities: * * *

"10. Bills of exchange, trade acceptances, promissory notes and other commercial paper issued, given or acquired in a bona fide way in the ordinary course of legitimate business, trade or commerce.

"11. Promissory notes, whether secured or unsecured, where the notes are not offered to the public, or are not sold to an underwriter for the purpose of resale."

"Sec. 2 * * * (c) Except as hereinafter expressly provided, the provisions of this act shall not apply to the sale of any security in any of the following transactions: * * *

"2. By or for the account of a pledge or mortgage selling or offering for sale or delivery in the ordinary course of business, to liquidate a bona fide debt, a security pledge in good faith as security for such debt.

"3. The sale in a bona fide way of any security by an owner who is not the issuer or an underwriter thereof, who sells the same for his own account; and not for the purpose of evading the provisions of this act."

"Sec. 3. No company shall sell, except upon a sale for a delinquent assessment * * * or offer for sale, negotiate for sale of, or take subscriptions for any security of its own issue until it shall have first applied for and secured from the commissioner a permit authorizing it so to do."

The appellant insists that there was no "sale" or "issuance" of these assignments contrary to the provisions of the Corporate Securities Act. Since section 2 (a) (8); as amended by St. 1929, p. 1251, § 1, defines "sale" or "sell" as including "every disposition, or attempt to dispose, of a security or interest in a security for value," and since section 12, quoted above, outlaws "every security issued by any company, without a permit of the commissioner," we believe such a contention to be extremely specious. Nor are we impressed with the argument that the act uses the word "sale" and "issue" synonymously. We entertain no doubt that the assignments at bar were "issued" by the Elmer Company, both in the popular and the legal senses.

But there is an even more clearly conclusive answer to this objection. As we have seen, the act defines "sale" as "every disposition, or attempt to dispose, of a security or interest in a security for value." Counsel for the appellant assert that "a pledgee has merely a special property or *interest in the thing pledged*." Therefore, it is obvious that, when the Elmer Company pledged these contracts for its debt to the De Mille Company, the former "disposed" or attempted to dispose, of an "interest in a security."

Accordingly, even if it be conceded that there is an identity of meaning between "sale" and "issue," there was clearly a "sale" of these securities within the purview of the act.

Under the definition of a "security" given in the act of 1929, supra, it is not necessary for the paper to be issued to the public. A single transaction, if it meets the definition of the statute, is sufficient to come within the purview of the act. Under the act of 1917, an issue to the public was required; but that language was dropped in the later enactment.

It is impossible, of course, to refer to cases decided by appellate courts where contracts of this precise character have been passed upon; for they represent "a relatively new phase of corporate financing." In re Hawkeye Oil Co. (D. C.) 19 F.(2d) 151, and In the Matter of Lathrap, 61 F.(2d) 37, decided by this court on August 10, 1932. But in proceeding from the old to the new, from the known to the unknown, reasoning by analogy is not only permissible but indispensable.

The courts of California have repeatedly held that assignments of the general character of those involved herein are "securities" that require permits for their issuance, under the provisions of the Corporate Securities Act.

In People v. Oliver, 102 Cal. App. 29, 36, 38, 282 P. 813, 817, decided November 15, 1929, hearing by the Supreme Court of California denied on December 14, 1929, the court said: "If the instrument of sale creates a present right to a present or a future participation in either the income, profits, or assets of a business carried on for profit, it is a 'security,' as defined in the Corporate Securities Act. Because the interest created will not return a profit until the performance of a future act, such as the sale of an interest in a patent, or the grant to a licensee of the right to use it, does not bring it without the provisions of this act. Agnew v. Daugherty, 189 Cal. 446, 209 P. 34. * * * If a unit issued by an individual represents a division of the assets of a business carried on for profit, or in the distribution thereof, or the right to participate in the profits,

earnings, or income derived from such assets, it is a security under the definition of subdivision 8, section 2, of the Corporate Securities Act as amended. Ex parte Girard, 186 Cal. 718, 200 P. 593."

See, also, Gracchi et al. v. Friedlander, etc., 93 Cal. App. 770, 270 P. 235, and People v. McCalla et al., 63 Cal. App. 783, 220 P. 436, petition for hearing denied by the Supreme Court of California on November 26, 1923.

The appellant relies heavily upon the case of Eberhard et al. v. Pacific Southwest Loan & Mortgage Corporation (Cal. Sup.) 1 P.(2d) 420, 421, judgment affirmed on rehearing, March 22, 1932 (Cal. Sup.) 9 P. (2d) 302. We have carefully examined that case, and do not believe that it is applicable here. This is disclosed by the following language of the court:

"The language of the Corporate Securities Act, as above set forth, would seem to be plain and unambiguous in its definition of what securities were intended to be brought within the purview of the act, and in its express provision excepting from such operation 'bills of exchange and promissory notes not offered to the public by the drawer, maker or underwriter thereof, and all mortgages and deeds of trust of property situated in this state, executed to secure the payment thereof.' The transaction set forth in the complaint is nothing more or other than that of a promissory note issued by a private corporation evidencing a loan, made by an individual creditor, secured by a mortgage upon specific real estate. The other transactions to which the defendant in its answer makes reference were of the same identical character, each pertaining to a specific loan of money from a private person, and each secured by a separate mortgage upon separate and specific property, and each in no wise connected with each other except in the fact that the parties to each transaction were the same. There is nothing contained in defendant's answer tending in the remotest degree to show that these separate and individual transactions were ever 'offered to the public' in the sense in which that term is employed in the Corporate Securities Act. Nor is there anything contained in the record herein to indicate that the Legislature had such private and individual transactions in mind in the adoption of the Corporate Securities Act, or that such transactions were sought to be embraced within the provisions of the act designed 'to prevent fraud in the sale of securities.' The

express exceptions embraced in the terms of the act as above set forth negative such an assumption, and we are fully satisfied that had the act not contained said exceptions it would have been unconstitutional and void as an unwarrantable interference with the rights of individuals in dealing with each other respecting their private transactions and private properties.

"The appellant relies in support of his appeal upon the case of People v. Leach, 106 Cal. App. 442, 290 P. 131. That was a criminal proceeding involving an alleged conspiracy between certain persons interested in the National Loan Company of Los Angeles and also in the Pacific Southwest Loan & Mortgage Corporation, and involving some of the transactions to which the defendant in its answer referred. The facts set forth in said proceeding are not before the court in the instant case, but, in so far as it was purported to hold that transactions of the character of that set forth in the complaint and admitted in the answer herein come within the purview of the Corporate Securities Act, the language and conclusion of that case touching that subject are hereby expressly disapproved."

There is one important observation to be made with regard to the Eberhard Case—an observation that apparently has been overlooked in the briefs. The Eberhard Case was not decided under the act of 1929, but under the Corporate Securities Act as it stood before that time. This is made certain by the language of the statute as quoted by the Supreme Court in that decision reproduced above, and also found on page 420 of the decision in 1 P.(2d): "By subdivision 6 of section 2 (St. 1917, p. 674) thereof the word 'security' includes '(b) All bonds, debentures, and evidences of indebtedness issued by any company * * * excepting therefrom the following: 1. Bills of exchange and promissory notes not offered to the public by the drawer, maker, or underwriter thereof, and all mortgages and deeds of trust of property situated in this state, executed to secure the payment thereof.'"

As we have seen, section 2 (b) (10), the portion of the statute of 1929 corresponding to the provision quoted in the Eberhard Case, *makes no specific exception in favor of mortgages or deeds of trust.* Section 2 (b) (11), indeed, exempts "promissory notes, whether secured or unsecured," but makes no reference to the *security* itself, whether pledge or mortgage.

We do not feel warranted in carrying the

exceptions in the 1929 statute beyond their terms. The emphasis laid upon the phrase "specific property" by the Supreme Court would indicate that the highest tribunal of this state would not be inclined to view a per cent. assignment, given in pledge for a debt in the same light as "a separate mortgage upon separate and specific property." At any rate, we are not prepared to indulge in any extension of meaning in interpreting this statute, in view of the plain language of section 2 (a) (7), quoted in full above, in which the word "security" is defined as "any * * * certificate of interest or participation, certificate of interest in a profit-sharing agreement, certificate of interest in an oil, gas or mining lease, * * * investment contract, or beneficial interest in title to property, profits or earnings or any other instrument commonly known as a security."

 The appellant urges that "if the transactions herein involved are in violation of the Corporate Securities Act of 1929, then the act is also unconstitutional," as being in violation of the Fourteenth Amendment of the United States Constitution and article 1, § 14, of the California Constitution, which latter provides that private property shall not be taken for public use without just compensation. It is contended that "an act is void where its language appears on its face to have a meaning, but it is impossible to give it any precise or intelligible application in the circumstances under which it is intended to operate." The appellant also cites cases dealing with freedom of contract.

We fail to find any provisions in the statute that encroach upon the appellant's constitutional rights.

The appellant urges that "a person who desires to make a pledge for the security of a debt, as in the transaction before this Court, must determine, at his peril, whether the same is offered to the public and also the pledgee, upon a sale, must determine whether the security is for a bona fide debt and given as a pledge in good faith as security for the debt." But reference to the act itself will reveal that the exemption is in favor of "promissory notes * * * given or acquired in a bona fide way in the ordinary course of legitimate business, trade or commerce," and "promissory notes, whether secured or unsecured, where the notes are not offered to the public, or are not sold to an underwriter for the purpose of resale." There is no exemption in favor of securities issued in pledge for a promissory note; therefore the question of whether such pledged securities are "offered to the public" becomes immaterial.

In any event, the Supreme Court of California has passed favorably upon the constitutionality of this very provision, in the recent case of In the Matter of Leach, 12 P. (2d) 3, 6. In that case the court said:

"It is next contended that the provisions of the Corporate Securities Act defining securities * * * issued by any company, excepting bills of exchange and promissory notes not offered to the public, are so vague, uncertain, and ambiguous as to render it unconstitutional on that account. This criticism of the act is directed to the exception which excludes bills of exchange and promissory notes 'not offered to the public' from the definition of securities as they are defined in the act. Petitioner contends that the word 'security' by reason of said exception used in the act is not defined with that degree of clarity * * * required of criminal statutes creating a new offense and providing for its punishment. The gist of petitioner's argument is that the words 'not offered to the public' are so uncertain, vague, and indefinite that a person of ordinary intelligence cannot understand their meaning. * * *

"The term 'offered to the public,' or one of similar import, is found in frequent use in the statutes of the various states which have enacted legislation like or similar to the Corporate Securities Act of this state. Our attention has been called to statutes of eleven states where such legislation is to be found. It would appear from this that the term is one of general use, and that it has a well-accepted and recognized meaning throughout many jurisdictions and especially among those dealing with corporate securities. Our attention has not been called to any instance, as shown by any reported case, where the meaning of the words 'offered to the public' has ever been called in question, or where any claim or contention has been made that their meaning was vague or ambiguous. This point was not even raised by petitioner, or at least it was not considered by the court in the appeal in the case of People v. Leach, supra. We think the meaning of the words is reasonably plain and free from any serious ambiguity, and that the ordinary person dealing in this class of securities would have no real difficulty in determining their meaning, and in conforming with the requirements of the section of the act governing the issue and sale of this class of securities."

We believe that the royalty assignments of

40 and 50 per cent. in the instant case were "securities" within the purview of the Corporate Securities Act of 1929, and, since they were issued without a permit from the Corporation Commissioner of California, we see each of them, in the words of Black v. Solano, supra, "as a blank piece of paper."

Accordingly, the order of the lower court is affirmed. We desire to make it plain, however, that, since the record indicates that the loans were made in good faith, the appellant is to be recognized as a general creditor of the Elmer Company to the extent of the unpaid balance on the loans.

Order affirmed.