No. 13-0733   SER State of West Virginia v. Honorable Robert A. Burnside, Jr., Judge, of the Circuit Court of Raleigh County; and Richard E. Hardison, Jr.

Sims, Judge., dissenting:

I respectfully dissent from the majority opinion.

The issue in this case is the statutory construction of the West Virginia Wiretapping Act, W.Va. Code §62-1D-1, *et seq.* [1987].

The law of statutory construction in West Virginia is well settled.  In *State of West Va. v. Cont'l Cas. Co.*, 130 W.Va. 147, 42 S.E. 2d 820 (1947), the Court held

> When a statute is clear and unambiguous, and the legislative intent is plain, the statute should not be interpreted by the courts. 50 Am. Jur., Statutes, Section 225. *See State ex rel. McLaughlin v. Morris*, 128 W.Va. 456, 37 S.E. 2d 85 (1946). In such case the duty of the courts is not to construe but to apply the statute. In applying the statute its words should be given their ordinary acceptance and significance and the meaning commonly attributed to them. 50 Am. Jur., Section 225. *See Moran v. Leccony Smokeless Coal Co.*, 122 W. Va. 405, 10 S. E. 2d 578 (1940), 137 A.L.R. 1007.

In *State v. Epperly*, 65 S.E.2d 488, 135 W.Va. 877 (1951), the Court reiterated that

> When a statute is clear and unambiguous, and the legislative intent is plain, the statute should not be interpreted by the courts.  *Hereford v. Meek*, 132 W.Va. 378, 52 S.E.2d 740 (1949); *State of West Virginia ex rel. Department of Unemployment Compensation v. Continental Casualty Company*, 130 W.Va. 147, 42 S.E.2d 820 (1947); *State ex rel. McLaughlin v. Morris*, 128 W.Va. 456, 37 S.E.2d 85 (1946); *State v. Patachas*, 96 W.Va. 203, 122 S.E. 545 (1924); 50 Am.Jur., Statutes, Section 225.  In such case the duty of the courts is not to construe but to apply the statute, and in so doing, its words should be given their ordinary acceptance and significance and the meaning commonly attributed to them.  50 Am.Jur., Statutes, Section 225.

Likewise, the United States Supreme Court has stated "[w]e begin with the familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language

1

must ordinarily be regarded as conclusive." *Consumer Product Safety Commission et al. v. GTE Sylvania, Inc. et al.*, 447 U.S. 102 (1980). "[I]n interpreting a statute a court should always turn to one cardinal canon before all others. . . . [C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-254 (1992). "When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.' *Rubin v. United States*, 449 U. S. 424, 430 (1981)." 503 U.S. 249, 254.

The final clause of W.Va. Code §62-1D-9(d) at issue in this case states as follows:

> That notwithstanding any provision of this article to the contrary, no device designed to intercept wire, oral or electronic communications shall be placed or installed in such a manner as to intercept wire, oral or electronic communications emanating from the place of employment of any attorney at law, licensed to practice law in this state.[1]

Simply put, the clause precludes law enforcement from electronically intercepting any communications emanating from a law office of any attorney licensed to practice law in this state. Period. The clause is clear, concise, unambiguous, plain in its meaning, and means exactly what it plainly expresses. Therefore, the clause must be applied, not construed, and "judicial inquiry is complete." Move along, nothing here to see.

---

[1] Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C.A. §2516(2) (the corresponding federal wiretapping act) permits the states to "adopt coordinate statutes permitting the interception or wire, oral or electronic communications, **and to grant greater**, but not lesser, protection than that available under federal law." The West Virginia Wiretapping Act, as enacted, clearly evidences the West Virginia Legislature's intent to grant greater protections to West Virginia licensed attorneys than that available under federal law. The majority notes that the absence of such a provision in the federal statute "demonstrates that Congress chose not to treat communications emanating from a law office differently than communications emanating from other locations." Therefore, it logically follows that the **inclusion** of the provision in the West Virginia statute **clearly** demonstrates that the West Virginia Legislature **chose** to treat communications emanating from a law office differently than communications emanating from other locations.

However, the majority finds otherwise. Out of thin air, the majority has determined that "an ambiguity arises" in the above-referenced clause. The majority declares that the clause "***appears*** to place a prohibition on *any* communication, privileged or otherwise, occurring between *any* persons located in a law office." (Emphasis added.) Any reasoned, rational reading of the clause in question leads to only one conclusion: that the statute does not "appear" to place such a prohibition, it <u>unequivocally and affirmatively</u> establishes such a prohibition.

In spite of this inescapable conclusion, the majority declines to construe the plain meaning of the clause and seeks to interpret it. The majority finds that the clause's meaning is not abundantly clear "[a]s demonstrated by the differing interpretations given the final clause by the parties to this appeal." The majority then cites, but inexplicably ignores, the holding in *State v. Gibson*, 226 W.Va. 568, 571, 703 S.E.2d 539, 542 (2010) that "the fact that parties disagree about the meaning of a statute does not itself create ambiguity or obscure meaning."

In rejecting the plain language of the clause, the majority sets out to rewrite the clause and, in doing so, manipulates the outcome in this matter to one more preferable to the majority. This type of judicial moonwalking has all of the earmarks of a "result-oriented decision."

The majority proceeds to do a judicial tap dance around the "legislative intent" of the statute and concludes that the statute's legislative history "does not provide guidance." The majority ignores the fact that the statute, enacted in 1987, was written by lawyers and then passed into law by a significant number of lawyers in the legislature. The statute says exactly what the legislature intended it to say. It places an absolute bar on law enforcement intercepting any communications occurring in a law office in this state of a licensed West Virginia lawyer.

3

The clear intent of the statute is to protect a centuries-old[2] sacrosanct public policy which predates the founding of this nation: the sanctity of attorney-client communication, the corresponding privilege afforded to the client, and the indispensable confidence and trust that must exist between an attorney and a client. Without a client's unfettered confidence and trust, the attorney-client relationship would be meaningless and non-existent. Any erosion of that confidence and trust threatens the very foundation of the legal profession.

In *United States v. Costen*, 38 F. 24, 24 (C.C.D. Colo. 1889), Justice Brewer stated

> Now, it is the glory of our profession that its fidelity to its client can be depended on; that a man may safely go to a lawyer and converse with him upon his rights or supposed rights in any litigation with the absolute assurance that that lawyer's tongue is tied from ever disclosing it; and any lawyer who proves false to such an obligation, and betrays or seeks to betray any information or any facts that he has attained while employed on the one side, is guilty of the grossest, breach of trust. I can tolerate a great many things that a lawyer may do,—things that in and of themselves may perhaps be criticised [sic] or condemned when done in obedience to the interest or supposed interest of his own client, and when he is seeking simply to protect and uphold those interests. If he goes beyond, perhaps, the limits of propriety, I can tolerate and pass that by; but I cannot tolerate for a moment, neither can the profession, neither can the community, any disloyalty on the part of a lawyer to his client. In all things he must be true to that trust, or, failing it, he must leave the profession.

The majority bases its rationale on the premise that "lawyers engaging in alleged criminal activity should be investigated and prosecuted to the same extent as non-lawyers." No one would disagree with that assertion. Indeed, law enforcement has significant tools, advantages and resources to investigate and bring to justice those who violate the law, including attorneys. However, the West Virginia Legislature, as a co-equal branch of government and is its right as a legislative body, definitively determined that protecting the sanctity of the attorney-client relationship from undo intrusion by law enforcement clearly outweighed law enforcement's

---

[2] The attorney-client privilege finds its roots in Roman law. *See* E. Cleary, *McCormick on Evidence* § 87 (2d edition 1972).

interests in utilizing the weapon of electronically intercepted communications emanating from a law office of any attorney licensed to practice law in this state.

The majority next finds that the clause, as written, leads to an "absurdity" by shielding attorneys, and others engaged in criminal activity in a law office, from being subject to electronic surveillance or wiretapping simply because the criminal activity allegedly is occurring in a law office. As a result, the majority has rewritten the clause to read:

> That notwithstanding any provision of this article to the contrary, no device designed to intercept wire, oral or electronic communications shall be placed or installed in such a manner as to intercept wire, oral or electronic communications emanating from the place of employment of any attorney at law, licensed to practice law in this state *unless said device intercepts communications which are determined by law enforcement, in its discretion, not to be attorney-client privileged communications.*

The rewritten statute opens a Pandora's Box of problems and challenges to open communication, complete confidentiality, and the indispensable trust that must exist between attorneys and clients in this state.

Consider the following:

A large law firm in Huntington/Charleston (pick one) employs an experienced and trusted paralegal. Unbeknownst to the law firm, paralegal is engaged in small time bookmaking/selling small amounts of marijuana (pick one) out of his office at the law firm. Law enforcement has probable cause and places a device to intercept oral conversations/telephone calls/email (pick one or more) in paralegal's office.

As a result, the following scenarios occur:

Scenario 1: Lawyer A is defending a highly contested criminal case. Lawyer A directs paralegal to interview potential witnesses who have not been listed in the prosecution's discovery or witness disclosure. Paralegal interviews witnesses who provide information which

5

is potentially damaging to defendant's case. The interviews are not privileged under West Virginia law. Law enforcement shares the intercepted recordings of paralegal's interviews of said witnesses with the prosecutor, who then amends the State's witness list to include the witnesses not previously known to him. As a direct result of the new witnesses' testimony, defendant is convicted.

Scenario 2: Lawyer B directs paralegal to assist him in drafting a settlement brochure for a client who was hit by a drunk driver. Lawyer informs paralegal that the case has significant settlement value, but client is about to be laid off from work and is in a difficult financial situation. As a result, client wants to settle quickly for the best pre-suit offer that is made. This communication is privileged under West Virginia law, but law enforcement is not up to speed on the law of privilege. Law enforcement is on a bowling team with the insurance adjuster and informs him of client's dire financial situation and desire for a quick settlement. Insurance adjuster makes a ridiculous, low-ball offer and refuses to settle for any amount near fair settlement value for the claim. Client directs Lawyer B to accept the bad faith, lowball offer.

Scenario 3: Lawyer C directs paralegal to assist him with drafting a plea agreement and sentencing memorandum in a low level, non-violent felony case, for which such offense a defendant routinely receives probation. Lawyer C casually informs paralegal that the judge in the case is a primate with low intellectual functioning and that the prosecutor is a slob with poor hygiene. This is a non-privileged communication under West Virginia law. Law enforcement, a former bailiff for the judge, gleefully informs the judge and the prosecutor of Lawyer C's opinions of them. Defendant pleads guilty. In an unprecedented move, prosecutor deviates from his standard practice and seeks the maximum penalty. To the surprise of Lawyer C, judge denies defendant probation and sentences him to the maximum penitentiary sentence.

Scenario 4: Lawyer D directs paralegal to assist in drafting a property settlement agreement in an uncontested divorce action. Lawyer D informs paralegal that client wants the matter finalized as quickly as possible because client recently engaged in an extra-marital affair, which is unknown to client's spouse. This communication is privileged under West Virginia law, but law enforcement doesn't care because client's spouse is law enforcement's second cousin once removed. Law enforcement informs client's spouse of client's dalliance, and client's spouse proceeds to do extreme physical violence to client and client's paramour.

The rewritten clause produces absurd, unjust and unconscionable results in each of the above four scenarios. The clause, as originally written, would prevent each of these results. It is eminently predictable that the rewritten clause will, in the future, produce equally troubling and disastrous results for lawyers and their clients alike.

The majority finally concludes that if it were to interpret the statute to say what is clearly says, that "law offices in West Virginia could become staging areas for criminal conduct." This conclusion is made without a scintilla of empirical data to support it. In the 27 years since the statute was first enacted, there is no evidence that lawyers in West Virginia have turned their offices into "staging areas for criminal conduct." In fact, the evidence is wholly to the contrary. The sparse history of the investigations and prosecutions of criminal activity by lawyers using their law offices as "staging areas for criminal conduct" has rarely, if ever, involved electronically intercepted communications emanating from a law office. Law enforcement indisputably has sufficient resources, without the use of electronically intercepted communications, to weed out those very few in the legal profession who are engaged in criminal activity out of their law office.

In paraphrasing Justice Samuel Ervin, Jr.'s eloquent dissent in *State v. Bridges*, 56 S.E.2d 397, 231 N.C. 163 (1949), what may be the ultimate fate of the accused in his case is of relatively minor importance in the sum total of things. In any event, his role on life's stage, like ours, soon ends. But what happens to the law in this case is of gravest moment. It must be realized that the consequences of the decision of this Court will not be confined to a single legal proceeding. This decision will be invoked in other legal proceedings as a guiding and binding precedent. This decision may now be used as a waterfall to steadily and relentlessly erode a bed rock and essential time-tested public policy of the inviolability of the attorney-client relationship. Such an end is far less desirable than that of hurrying a single sinner to what may be his merited doom.

"They who would give up essential liberty, to purchase a little temporary safety, deserve neither liberty nor safety." Benjamin Franklin for the Pennsylvania Assembly in its *Reply to the Governor* (November 11, 1755).

In permitting electronically intercepted non attorney-client communications emanating from a law office of any attorney licensed to practice law in this state, the majority has placed the sanctity of the attorney-client relationship on a dangerous slope. If the majority opinion does not cause significant concern for all attorneys and their clients in this state, it ought to. Beware: you are on notice that someone may be listening.