CHICAGO MERCANTILE EXCHANGE, a corporation, John E. Coleman, Inc., a corporation, John D. Terpstra, George A. Hoffman, National Produce Distributors, Inc., a corporation, Nathan A. Wertheimer, William H. Burfisher, and Markman National Farming Company, a corporation, Plaintiffs,

v.

Robert TIEKEN, United States Attorney for the Northern District of Illinois, Defendant.

Civ. A. No. 58 C 1690.

United States District Court
N. D. Illinois, E. D.

Dec. 2, 1959.

Glenn G. Paxton, Jack K. Hudson, Chicago, Ill., for plaintiff.

George Cochran Doub, Asst. Atty. Gen., Robert Tieken, U. S. Atty., Chicago, Ill., Donald B. MacGuineas, Harland F. Leathers, and Richard M. Meyer, Attys., Dept. of Justice, Washington, D. C., for defendant.

Before HASTINGS, Circuit Judge, and PERRY and HOFFMAN, District Judges.

HOFFMAN, District Judge.

This is a class action in which the plaintiffs seek an injunction and a declaration that the Onion Futures Act (hereafter "Act"), 72 Stat. 1013, 7 U.S.C.A. § 13-1, is unconstitutional. The Act provides in relevant part that:

"* * * no contract for the sale of onions for future delivery shall be made on or subject to the rules of any board of trade in the United States."

Violation of the Act is a misdemeanor, and the maximum penalty is a fine of $5,000.

The plaintiff Exchange is a board of trade within the meaning of the Act. The other plaintiffs are connected with the Exchange and are proper parties. The defendant has not questioned the propriety of a class action.

The cause is presented to the court on the defendant's motion for dismissal or summary judgment. In order better to appreciate the issues raised by the motion, it is necessary to set forth a history of this case from the date on which the original complaint was filed.

On September 12, 1958, the plaintiffs filed their complaint against Robert Tieken, United States Attorney for the Northern District of Illinois, and William P. Rogers, the Attorney General of the United States. In addition, the plaintiffs moved for the convening of a three-judge court, and for a temporary restraining order and a preliminary injunction to prohibit the defendants from enforcing the provisions of the Act. A three-judge court was convened. Thereafter, the defendants moved to dismiss the complaint on the grounds (1) that the Act was constitutional; (2) that the court lacked jurisdiction over the subject matter because there was no justiciable controversy; and (3) that the court lacked jurisdiction over the person of the Attorney General who was alleged to be an indispensable party. On September 25, 1958, the plaintiffs filed an amendment and supplement to the complaint. The complaint was then dismissed as to the Attorney General. Since he had not been served within the territorial limits of the court, the court lacked jurisdiction over him. Blackmar v. Guerre, 1952, 342 U.S. 512, 72 S.Ct. 410, 96 L.Ed. 534; Goldberg v. Hoffman, 7 Cir., 1955, 225 F.2d 463. However, the action was not dismissed *in toto* because the court concluded that the Attorney General was not an indispensable party. See Hynes v. Grimes Packing Co., 1949, 337 U.S. 86, 69 S.Ct. 968, 93 L.Ed. 1231; Williams v. Fanning, 1947, 332 U.S. 490, 68 S.Ct. 188, 92 L.Ed. 95.

On September 26, 1958, after full argument was heard, a majority of the court temporarily enjoined the defendant from enforcing the Act. By so doing, the majority rejected the defendant's contentions that there was no justiciable controversy and that the plaintiffs had not

made the requisite showing of irreparable injury.

On April 13, 1959, pursuant to leave first obtained, the plaintiffs filed an amended complaint which was answered by the defendant on April 24, 1959. The amended complaint contained numerous detailed allegations intended to contradict the evidence presented to Congress with reference to trading in onion futures. The defendant moved to strike these allegations, contending that, since the legislative record contained adequate and reasonable grounds for the enactment of the legislation in question, the court was precluded from taking additional evidence on this matter. In opposition to the motion, the plaintiffs asserted that they should be permitted to prove, by evidence extrinsic to the legislative record, that the Act did not have a rational basis in fact. In a memorandum opinion written by Circuit Judge Hastings, the court concluded that:

" * * * the question is 'at least debatable': whether commerce in onions futures should be wholly prohibited, and that, therefore, a rational factual basis exists for the act." 177 F.Supp. 660, 666.

Accordingly, the court granted the defendant's motion to strike as to paragraphs 13, 14, 16 through 23, and 25 through 31, which paragraphs related to the facts found by Congress. See Galvan v. Press, 1954, 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911; American Communications Association v. Douds, 1950, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925; Clark v. Paul Gray, Inc., 1939, 306 U.S. 583, 59 S.Ct. 744, 83 L.Ed. 1001; United States v. Carolene Products Co., 1938, 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234; Board of Trade of City of Chicago v. Olsen, 1923, 262 U.S. 1, 43 S.Ct. 470, 67 L.Ed. 839; and Moore v. Chicago Mercantile Exchange, 7 Cir., 1937, 90 F. 2d 735, certiorari denied 1937, 302 U.S. 710, 58 S.Ct. 30, 82 L.Ed. 548. In addition, the court granted the defendant's motion as to paragraphs 6 through 11. Although these allegations were descriptive of the nature of futures trading, it was held that the court could

" * * * take judicial notice from the provisions of the Commodity Exchange Act that futures trading is generally accepted, under proper regulation, as a useful and lawful business. See Title 7 U.S.C. A. § 5." 177 F.Supp. 660, 666.

On October 12, 1959, the defendant moved for dismissal or summary judgment. The plaintiffs then moved the court to vacate its order on the motion to strike. Also, the plaintiffs offered to prove the facts in support of the stricken allegations. However, the court denied the motion to vacate and rejected the offer of proof. Consequently, there remained for consideration only the defendant's motion for dismissal or summary judgment. On November 10, 1959, the court unanimously granted the motion to dismiss and dissolved the preliminary injunction. The order stated that a memorandum would be filed in due course. This is the memorandum referred to.

In support of the motion, the defendant contends (1) that there is no justiciable controversy and (2) that the Act is constitutional as a matter of law. With reference to the issue of justiciability, the defendant asserts that the plaintiffs have not made that showing of irreparable injury which warrants enjoining the enforcement of a criminal statute. The same assertion was made by the defendant in opposition to the plaintiffs' motion for a preliminary injunction, and a majority of the court rejected it. Although I believe that the defendant's position is sound, Spielman Motor Sales Co. v. Dodge, 1935, 295 U.S. 89, 95–96, 55 S.Ct. 678, 79 L.Ed. 1322, the majority adheres to its former conclusion. Accordingly, it is the opinion of the court that a justiciable controversy does exist, and that it is necessary to determine the constitutionality of the Act.

With reference to the merits of the controversy, consideration will first be given to the history of trading in onion

futures. Prior to 1955, trading in onion futures was not regulated by Congress. In 1955, as a result of severe fluctuations in the cash price of onions, which fluctuations were attributed to trading in onion futures, the Commodity Exchange Act, 7 U.S.C.A. §§ 1–17a, was amended to include onions, and the Commodity Exchange Authority was given a limited measure of power to regulate trading in onion futures. H. R. Rep. No. 1036, 85th Cong., 1st Sess. 2 (1957). However, the cash price of onions continued to fluctuate severely and, in 1956, Congress gave consideration to prohibiting trading in onion futures. Hearings were held, and the House Committee on Agriculture concluded that there was a causal relationship between trading in onion futures and fluctuations in the cash price of onions. The Committee recommended that futures trading be prohibited if the futures market could not be operated so as to prevent injury to onion producers. See H. R. Rep. 1036, 85th Cong., 1st Sess. 3 (1957). In February 1957, a severe fluctuation in the cash price of onions gave rise to further demands for prohibitive legislation. Hearings were again held, numerous witnesses testified, both for and against prohibition, and the House Committee made the following written findings:

"(1) That while there may not be any effect on long-run or season average cash prices of onions resulting from futures trading, there is little doubt but that *variations in price on the futures market do have a direct and pronounced effect over short periods of time on cash onion prices.*

"(2) In contrast to some other commodities where there is wide use of the futures market for hedging purposes by buyers of such commodities, *there is relatively little buyer hedging in onion futures.*

"(3) That a number of growers do make use of futures market and the record shows that there have been few, if any, years when the producer could not at some time dur-ing the growing season have hedged his production at a satisfactory price. The record is equally clear, however, that *relatively few producers have the financial resources to engage in a substantial hedging operation.*

"(4) In spite of the improvements in the trading environment which have been brought about as the result of CEA jurisdiction and by action of the Exchange itself, it seems clear that *violent fluctuations can still take place on the futures market without any relationship to supply and demand factors and that these price fluctuations can and will have an effect on the cash onion market.*" H. R. Rep. No. 1036, 85th Cong., 1st Sess. 3–4 (1957) (emphasis added)

Accordingly, the House Committee recommended the prohibition of trading in onion futures. The same recommendation was made by the Senate Committee on Agriculture and Forestry which stated in its report:

"In 1955, because speculative activity in the futures market was apparently adversely affecting cash onion prices, Congress added onions to the commodities subject to regulation under the Commodity Exchange Act, effective September 24, 1955. This has not cured the situation, however. It now appears that speculative activity in the futures markets causes such severe and unwarranted fluctuations in the price of cash onions as to require complete prohibition of onion futures trading in order to assure the orderly flow of onions in interstate commerce." S. Rep. No. 1631, 85th Cong. 2d Sess. 1 (1958), U.S.Code Cong. and Adm. News 1958, p. 4210.

As the Committee Reports indicate, Congress recognized that trading in onion futures was not inherently illegal and that it could serve a useful economic purpose, *i. e.,* hedging. However, Congress also found, on the evidence presented to it, that the speculative aspect of trading in onion futures caused severe

and unwarranted price fluctuations and, hence, burdened interstate commerce in onions. Consequently, Congress, by the enactment of the legislation in question prohibited trading in onion futures. And, as we have held, there was a rational factual basis for the prohibition.

The issues now presented to us are (1) Whether the authority of Congress over interstate commerce embraces prohibition of the plaintiffs' business. And (2) if so, whether prohibition is proscribed by the due process clause of the Fifth Amendment.

 In considering these issues, it should be remembered that they arise in the context of a motion for summary judgment.[1] Such a motion is to be granted only if there is no genuine issue as to any material fact and if the movant is entitled to judgment as a matter of law. Rule 56(c), Federal Rules of Civil Procedure, 28 U.S.C.A. However, in determining whether these conditions exist, it is proper for the court to employ the doctrine of judicial notice. Ellis v. Cates, 4 Cir., 1949, 178 F.2d 791, certiorari denied 1949, 339 U.S. 964, 70 S.Ct. 999, 94 L.Ed. 1373. The plaintiffs have requested the court to take judicial notice of the "fact" that their business (trading in onion futures) is lawful, useful, and essentially harmless. We note that, absent a statute to the contrary, the business is lawful. See Board of Trade of City of Chicago v. Christie Grain & Stock Co., 1905, 198 U.S. 236, 25 S.Ct. 637, 49 L.Ed. 1031, in which the Supreme Court rejected the contention that futures trading was "tainted with illegality." Also, we note that the business is useful, in that it can serve the useful economic purpose of hedging. However, we cannot note that the business is essentially harmless. In this regard, we must ask, "essentially harmless to what?" And the question must be answered with reference to interstate commerce in onions. Is the plaintiffs' business essentially

harmless to interstate commerce in onions? We think not. As we have already stated, Congress, on the basis of the evidence before it, found that the speculative aspect of plaintiffs' business caused severe and unwarranted fluctuations in the cash price of onions to the detriment of onion producers and to the detriment of "the orderly flow of onions in interstate commerce." See S. Rep. No. 1631, 85th Cong., 2d Sess. 1 (1958). In effect, Congress found that the plaintiffs' business was harmful to interstate commerce in onions. As disclosed by the legislative record, there is a rational basis in fact for this finding. We take judicial notice of it, and we conclude that there is no genuine dispute as to any fact material to the nature of the plaintiffs' business.

 The plaintiffs also assert that their business is wholly intrastate. Since this assertion is denied by the defendant, it might seem that there is a genuine dispute as to a material fact. However, such is not the case because the plaintiffs admit that their business affects interstate commerce. In view of the authority which Congress possesses over activities which affect interstate commerce (see Wickard v. Filburn, 1942, 317 U.S. 111, 120–125, 63 S.Ct. 82, 87 L.Ed. 122), it becomes immaterial to consider whether plaintiffs' business is local or interstate. Therefore, we conclude that there is no genuine dispute as to any material fact in this case, and we proceed to a discussion of whether the Act is constitutional.

 Initially we must inquire whether Congress has the authority to prohibit an activity which has a harmful effect on interstate commerce. The extent of Congressional authority over matters of interstate commerce has been commented upon in numerous cases. In Kentucky Whip & Collar Co. v. Illinois Cent. R. Co., 1937, 299 U.S. 334, 57 S.Ct. 277, 81 L.Ed. 270, the Court sustained the constitutionality of a federal statute which

[1]. For purposes of this memorandum opinion, we treat the defendant's motion for dismissal or summary judgment as one for summary judgment *only*.

*prohibited* the transportation of convict-made goods into any state in which the goods were intended to be received, sold, or used in violation of its laws. The Court observed:

"Petitioner's argument necessarily recognizes that in certain circumstances an absolute prohibition of interstate transportation is constitutional regulation. The power to prohibit interstate transportation has been upheld by this Court in relation to diseased livestock, lottery tickets, commodities owned by the interstate carrier transporting them, except such as may be required in the conduct of its business as a common carrier, adulterated and misbranded articles, under the Pure Food and Drugs Act [21 U.S.C.A. § 1 et seq.], women, for immoral purposes, intoxicating liquors, diseased plants, stolen motor vehicles, and kidnaped persons.

"The decisions sustaining this variety of statutes disclose the principles deemed to be applicable. We have frequently said that in the exercise of its control over interstate commerce, the means employed by the Congress may have the quality of police regulations * * *. The power was defined in broad terms in Brooks v. United States, 267 U.S. 432, 436, 437, 45 S.Ct. 345, 346, 69 L.Ed. 699: 'Congress can certainly regulate interstate commerce *to the extent of forbidding and punishing* the use of such commerce as an agency to promote immorality, dishonesty *or the spread of any evil or harm to the people of other states from the state of origin*. In doing this it is merely exercising the police power, for the benefit of the public, within the field of interstate commerce.'

"The anticipated evil or harm may proceed from something inherent in the subject of transportation as in the case of diseased or noxious articles, which are unfit for commerce * * *. Or the evil may lie in the purpose of the transportation, as in the case of lottery tickets, or the transportation of women for immoral purposes. * * * The prohibition may be designed to give effect to the policies of the Congress in relation to the instrumentalities of interstate commerce, as in the case of commodities owned by interstate carriers * * *. And, while the power to regulate interstate commerce resides in the Congress, which must determine its own policy, the Congress may shape that policy in the light of the fact that the transportation in interstate commerce, if permitted, would aid in the frustration of valid state laws for the protection of persons and property." 299 U.S. at pages 346–347, 57 S.Ct. at page 279. (emphasis added; footnotes and citations omitted)

Similar statements as to the breadth of Congressional authority over interstate commerce or matters affecting interstate commerce are to be found in Wickard v. Filburn, 1942, 317 U.S. 111, 120–125, 63 S.Ct. 82, 87 L.Ed. 122; United States v. Wrightwood Dairy Co., 1942, 315 U.S. 110, 119, 62 S.Ct. 523, 86 L.Ed. 726; United States v. Darby, 1941, 312 U.S. 100, 112–115, 61 S.Ct. 451, 85 L.Ed. 609; and United States v. Carolene Products Co., 1938, 304 U.S. 144, 146–147, 58 S.Ct. 778, 82 L.Ed. 1234. That this authority embraces trading in commodity futures is made manifest by Board of Trade of City of Chicago v. Olsen, 1923, 262 U.S. 1, 43 S.Ct. 470, 67 L.Ed. 839; Nelson v. Secretary of Agriculture, 7 Cir., 1943, 133 F.2d 453; and Moore v. Chicago Mercantile Exchange, 7 Cir., 1937, 90 F.2d 735, certiorari denied 1937, 302 U.S. 710, 58 S.Ct. 30, 82 L.Ed. 548. All of these cases clearly support the propositions that the test of Congressional authority over an activity which affects interstate commerce is the effect upon interstate commerce, and not the source of the activity; that the authority is plenary or complete, and may be exercised to its utmost extent, and

that the authority embraces prohibition of an activity which injuriously affects interstate commerce.

Accordingly, we conclude that, under its power over interstate commerce, Congress may prohibit trading in onion futures. We now turn to the question of whether such prohibition is consonant with due process of law.

Legislation is unconstitutional, as a violation of due process, only if it is unreasonable, arbitrary, capricious, or without any substantial relation to a legitimate end. Nebbia v. People of State of New York, 1934, 291 U.S. 502, 525, 54 S.Ct. 505, 78 L.Ed. 940. In short, constitutionality depends upon whether, considering all the facts, the legislation has a rational basis. For purposes of determining whether this court should take additional evidence as to the matters presented to Congress and the conclusions made by it, we have already held that the Act has a rational factual basis. Now, for purposes of determining constitutionality under the due process clause, we reach the same conclusion.

It is established that the speculative aspect of trading in onion futures is a cause of severe and unwarranted fluctuations in the cash price of onions. It was for Congress to determine whether such harmful speculation was to be regulated or prohibited. Initially, Congress determined that regulation was necessary; next Congress determined that regulation was ineffective; and, finally, Congress determined that prohibition was the course to be adopted. We may disagree on the merits with any of these determinations. We may be dissatisfied with the quantity or quality of the evidence upon which these determinations were made. But we cannot say that these determinations were unreasonable, arbitrary, or capricious.

The end (facilitating the orderly flow of onions in interstate commerce by diminishing severe and unwarranted price fluctuations) is, as we have stated, within the authority of Congress over interstate commerce. Hence, the end is legitimate.

The means (prohibition of that which has been determined to be a cause of severe and unwarranted fluctuations) bears a substantial relation to the end. It may be that, because of such factors as "perishability, limited storability, and inelastic demand," the cash price of onions cannot be completely stabilized. See H. R. Rep. No. 1036, 85th Cong. 1st Sess. 4 (1957). However, this does not mean that the risk of severe and unwarranted instability cannot be diminished by prohibition of that which materially adds to the risk. And even the possibility that prohibition may prove to be ineffective does not suffice to render the Act unconstitutional. The due process clause cannot be used as a strait-jacket to bind Congress in the enactment of reasonable, experimental, economic or social legislation. See Lincoln Federal Labor Union, etc. v. Northwestern Iron & Metal Co., 1949, 335 U.S. 525, 536–537, 69 S.Ct. 251, 93 L.Ed. 212; A. F. of L. v. American Sash & Door Co., 1949, 335 U.S. 538, 542–547, 69 S.Ct. 258, 260, 93 L.Ed. 222 (concurring opinion of Mr. Justice Frankfurter); Nebbia v. People of State of New York, 1934, 291 U.S. 502, 525–529, 54 S.Ct. 505, 78 L.Ed. 940; and Lochner v. State of New York, 1905, 198 U.S. 45, 74–76, 25 S.Ct. 539, 49 L.Ed. 937 (dissenting opinion of Mr. Justice Holmes).

Nor does it suffice to argue, as the plaintiffs do, that the due process clause proscribes the prohibition of a business which is lawful, useful, and essentially harmless, even though it is attended by abuses. This argument might have been forceful in a bygone era of constitutional interpretation. See Adams v. Tanner, 1917, 244 U.S. 590, 37 S.Ct. 662, 61 L.Ed. 1336, criticized, 27 Yale L. J. 134 (1917). However, it is without force today. Lincoln Federal Labor Union, etc. v. Northwestern Iron & Metal Co., 1949, 335 U.S. 525, 529, 69 S.Ct. 251, 93 L.Ed. 212. Moreover, the argument demonstrates an erroneous approach to problems of constitutional interpretation. It repeatedly emphasizes the usefulness and the alleged essential harmlessness of plaintiffs' busi-

ness and subtly de-emphasizes the basis of constitutionality—the necessity for Congressional action to prevent a misuse of interstate commerce. As was stated in Kentucky Whip & Collar Co. v. Illinois Cent. R. Co., 1937, 299 U.S. 334, 347–348, 57 S.Ct. 277, 281, 81 L.Ed. 270:

> "The contention is inadmissible that the Act of Congress is invalid merely because the horse collars and harness which the petitioner manufactures and sells are useful and harmless articles. The motor vehicles, which are the subject of the transportation prohibited in the National Motor Vehicle Theft Act [18 U.S.C.A. § 2311 et seq.], are in themselves useful and proper subjects of commerce, but their transportation by one who knows that they have been stolen is a 'gross misuse of interstate commerce' * * *."

Even if it were a rule of constitutional law that Congress may not prohibit a lawful, useful, and essentially harmless business, the rule could not be applied to the instant case. We have already stated that the question of whether the plaintiffs' business is essentially harmless cannot be answered in a vacuum. Rather, it must be answered with reference to interstate commerce; and the answer is that trading in onion futures is harmful. As the plaintiffs admit,

> " * * * a substantial speculative interest is useful and necessary in a futures market in any commodity in order to provide liquidity and enable such market to operate as an efficient hedging medium." (Pl. Br. in opposition to Def. Motion to Dismiss or for Summary Judgment, p. 18)

And it is this same speculative interest which Congress deemed harmful to interstate commerce in onions when it observed:

> "It now appears that speculative activity in the futures market causes such severe and unwarranted fluctuations in the price of cash onions

as to require complete prohibition of futures trading in order to assure the orderly flow of onions in interstate commerce." S. Rep. No. 1631, 85th Cong. 2d Sess. 1 (1958)

and

> " * * * variations in price on the futures market do have a direct and pronounced effect over short periods of time on cash onion prices." H. Rep. No. 1036, 85th Cong. 1st Sess. 3 (1957)

Accordingly, plaintiffs cannot be heard to argue that their business is essentially harmless.

■ But one matter remains to be discussed. Plaintiffs assert that the Act is unreasonably discriminatory. In support of this assertion, plaintiffs argue that trading in onion futures is prohibited; that trading in the futures of all other commodities is permitted; that an unreasonable discrimination is thereby effected; and that the result of such discrimination is that the onion industry is deprived of the economic benefits of futures trading. These arguments are not well taken. As was stated by Circuit Judge Hastings in his memorandum opinion on defendant's motion to strike:

> "There was much testimony to the effect that onions, because of their perishable nature and because of the fact that they are a relatively small crop and require very little processing before sale, are not a proper commodity for trade on the futures market." 177 F.Supp. 660, 666.

Consequently, assuming *arguendo* that the legislation in question is discriminatory, the discrimination is not unreasonable. To the contrary, it arises from differences which have been found to exist between onions and other commodities.

For the reasons above stated, we conclude that the Onion Futures Act is constitutional. An order has already been entered dismissing the amended complaint with costs to the defendant, and dissolving the preliminary injunction.