**SALOMON FOREX INC., Plaintiff,**

v.

**Laszlo N. TAUBER, Defendant.**

**Laszlo N. TAUBER, M.D., Counter–Plaintiff and Third–Party Plaintiff,**

v.

**SALOMON FOREX INC., Counter–Defendant,**

v.

**SALOMON BROTHERS INC., et al., Third–Party Defendants.**

Civ. No. 91–1415–A.

United States District Court, E.D. Virginia, Alexandria Division.

June 1, 1992.

---

769

Eugene D. Gulland, William D. Iverson, Marc Mayerson, Eric Lasker, Laura M. Steeves, Covington & Burling, Washington, D.C., for plaintiff Salomon Forex, Inc. and third-party defendants Salomon Bros. Inc. and Salomon Inc., Gatling.

Wise, David Hilton Spriggs & Hollingsworth, Washington, D.C., for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

### INTRODUCTION

This case presents a significant question concerning the scope of the Commodity Exchange Act, as amended, 7 U.S.C. §§ 1 et seq. (1980 & Supp.1992) ("CEA"). At issue specifically is whether certain foreign currency trading contracts are exempt from CEA regulation.

Salomon Forex Inc. ("Salomon Forex"), a foreign currency brokerage company, sued Dr. Laszlo Tauber, an individual foreign currency trader, for breach of sixty-eight foreign currency trading contracts. Tauber filed a counterclaim against Salomon Forex and certain third-party defendants[1]

challenging the validity of over 2700 foreign currency trading contracts, including the sixty-eight disputed in the complaint. A host of issues came before the Court on the parties' motions for summary and partial summary judgment. Addressed here is the threshold question, novel in this circuit and others, whether the foreign currency transactions into which Salomon Forex and Tauber entered are exempt from CEA regulation. For the reasons elaborated below, the Court concludes that the foreign currency contracts at issue are not within the scope of the CEA. The consequence of this is that counterclaims and defenses to contract formation and enforceability based on CEA violations fail.[2]

### FACTS

Salomon Forex is a prominent foreign currency trading company with offices in New York, London, Tokyo, and the world's principal foreign exchange markets. Tauber, a general surgeon practicing in Northern Virginia, is by all accounts an unusual person. The record indicates that he is a physician with an active medical practice who is also a major real estate investor[3] and foreign currency trader. It is the latter incarnation that is relevant here. Evidence suggests his net worth exceeds half a billion dollars.

Since 1981, Tauber has engaged in extensive foreign currency trading involving billions of dollars worth of foreign currency, primarily Swiss francs and Australian dollars. Over the years, Tauber has traded large quantities of foreign currency with at least fourteen well-known brokerage com-

1. The third-party defendants are Salomon Brothers, Inc., Salomon, Inc., and Fred Gatling, Vice President of Salomon Brothers, Inc. Paul Mozer, head of the foreign exchange desk for Salomon Forex from 1990 to 1991 an original third-party defendant, was dismissed from the case for lack of personal jurisdiction.

2. A number of other defenses and counterclaims were also raised by the pleadings and disposed of by the Court on summary judgment, leading to a grant of summary judgment in favor of Salomon Forex for $25,831,453.01, plus pre-judgment interest at the Virginia statutory rate. Among the issues involved in these other defenses and counterclaims were allegations of

common law and statutory fraud, violations of state "bucketing" and gambling laws, negligence, breach of fiduciary duty, duress, failure to mitigate damages, estoppel, waiver, statute of frauds violations, breach of an implied covenant of good faith and fair dealing, breach of an express warranty of "best pricing," and breach of a duty to disclose material information relating to purported market manipulation.

3. Included among Tauber's real estate interests across the country is a seventy-five percent share in Laszlo N. Tauber & Associates, which is one of the federal government's largest private landlords.

panies. In addition, Tauber traded foreign currency through his wholly-owned foreign currency trading company, Westwood Options, Inc., holder of a seat on the Philadelphia Stock Exchange, the nation's largest foreign currency exchange. To facilitate his foreign currency trading, Tauber subscribed to "Telerate," a computerized Dow–Jones service providing current market quotations and related data. Using Telerate, Tauber monitored foreign currency markets from computer terminals in his home and elsewhere. Tauber also maintained foreign bank accounts, which he used on several occasions to effectuate foreign currency transactions. And Tauber occasionally used foreign currency mortgages in connection with his real estate holdings. Notwithstanding Tauber's self-serving assertions to the contrary, the record evidence persuasively establishes that Tauber was a sophisticated foreign currency trader during the time relevant to this action.

Tauber engaged in foreign currency transactions with Salomon Forex from 1987 to 1991. He was Salomon Forex' only non-institutional client during this period. Salomon Forex' complaint arises over sixty-eight foreign currency futures[4] and options contracts that matured, and in the case of the options, were exercised in July and August of 1991. Tauber's counterclaim concerns 1,260 foreign currency futures contracts and 1,442 foreign currency options contracts. None of the contracts involved in the complaint or the counterclaim were executed on a board of trade or a formally organized exchange.[5] They were, in other words, conducted "off-exchange."[6]

A futures contract is a contract for the purchase or sale on a specific date in the future (the "trade date") of a specified amount of foreign currency at an agreed value. When the trade date arrives, the parties are obligated to consummate the transaction by delivery or receipt of the currency at the agreed price. Tauber and Salomon Forex both acted as buyers and sellers in their futures contracts. Frequently, they arranged off-setting transactions involving exactly the same amount of foreign currency in lieu of actual delivery or receipt of currency. The precise form of the set-off varied depending on market conditions, the investment strategies of the parties, and the like. The futures contract inured to the benefit of the buyer if the agreed price turned out to be lower than the market price on the trade date and to the seller if the agreed price was higher.

*Options contracts function differently.* In an options contract, one party pays the other a fee for the right—or option—to purchase or sell a specific amount of foreign currency on a future date certain at an agreed price. At various times during the course of their dealings, both Tauber and Salomon Forex held purchase or sale options offered by the other. If on the agreed date the transaction benefitted the option holder, the option holder exercised it, and the offering party was then obligated to purchase or sell foreign currency as specified in the contract. Usually, but not always, Tauber supplanted actual delivery or receipt of the foreign currency with an off-setting transaction.[7] If exercising the option would not be advantageous, the option holder did nothing and merely sacrificed the amount of the fee.

**4.** This nomenclature, used throughout this memorandum opinion, does not reflect any decision by the Court that these contracts were "futures" rather than "cash forwards" contracts for purposes of determining whether they might be exempt from the CEA under the "cash forwards contracts" exemption. *See* 7 U.S.C. §§ 2, 6(a). Given the result reached here, that issue need not be decided and is left for another day.

**5.** Under the CEA, a "board of trade" is "any exchange or association, whether incorporated or unincorporated, of persons who shall be en-

gaged in the business of buying or selling commodity or receiving the same for sale on consignment." 7 U.S.C. § 2.

**6.** Tauber's course of dealing with Salomon Forex was not unusual in this regard. Much of his trading with other major brokerage firms also occurred off-exchange.

**7.** The record shows that on at least four occasions Tauber took actual delivery of foreign currency.

Tauber generally provided collateral, usually consisting of letters of credit or secured interests in other assets, for the foreign currency contracts made with Salomon Forex. In the event Tauber was unable to meet his contractual obligations, due to an inability to pay for currency he was obligated to purchase or to provide currency he was obligated to sell, Salomon Forex could look to the collateral to cover the resulting indebtedness. This case stems in part from Tauber's failure to post adequate security.

Specifically, by letter dated September 10, 1990, Tauber acknowledged his exposure to Salomon Forex to be approximately $24 million. He promised to provide additional security. By letter agreement dated February 21, 1991, the parties agreed to interim measures to protect Salomon Forex against losses incurred as a result of Tauber's foreign currency trading. These arrangements were to continue until August 31, 1991. Tauber failed to comply with the terms of this letter agreement, as well as with subsequent written and oral agreements to post additional collateral made as late as May 1991. Thus, when $25,831,453.01 became due and payable by Tauber under the sixty-eight contracts that matured in July and August 1991, Salomon Forex was inadequately secured. This lawsuit ensued.

## ANALYSIS

The threshold issue raised by the parties' motions is whether the disputed foreign currency contracts violated the CEA. If so, the contracts would be unenforceable as a matter of law, and the controversy would cease in so far as the enforceability of the contracts is concerned. If, on the other hand, the contracts did not violate the CEA, the Court would then need to consider defendants' other defenses to contract formation and enforceability. For the purposes of this case, divining whether the contracts violated the CEA entails two steps. First is the question whether the contracts are exempt from the CEA under the so-called "Treasury Amendment," 7 U.S.C. § 2. If so, the inquiry under the CEA ends. If not exempt, the second question is whether the contracts are exempt under any other CEA provision apart from the Treasury Amendment.[8]

Congress enacted the CEA, as amended, 7 U.S.C. §§ 1 *et seq.* (1980 & Supp.1992), to combat excessive speculation and price manipulation in commodity trading involving future delivery as commonly conducted on a board of trade. *See* 7 U.S.C. § 5. The CEA established the Commodity Futures Trading Commission (the "CFTC"), *see* 7 U.S.C. § 4a, and empowered it to regulate commodity trading for future delivery conducted on boards of trade in accordance with the regulatory scheme embodied in the statute. *See* 7 U.S.C. §§ 1 *et seq. See generally Statutory Interpretation Regarding Trading in Foreign Currencies For Future Delivery,* 50 Fed.Reg. 42983, [1984–86 Transfer Binder] Comm.Fut.Law Rep. ¶ 22,750, at 31,121 (Oct. 23, 1985) (the "CFTC Statement"). Prior to 1974, the CEA governed only certain enumerated, generally agricultural commodities. *See* 7 U.S.C. § 2 (1970). Over the years, Congress modified and expanded the CEA's definition of "commodity". Significantly, in 1974, Congress enlarged the definition effectively to include foreign currency and other financial instruments.[9] *See* Commodity Futures Trading Commission Act of

---

**8.** Given the dispositive result here of the first step, the Court did not reach this second step. Salomon Forex argued two additional statutory exemptions. First, it asserted that the futures contracts were exempt under the "cash forwards contracts" exemption. *See* 7 U.S.C. §§ 2, 6a. Second, it claimed that the options contracts were exempt under the "trade options" exemption. *See* 7 U.S.C. §§ 6c(b) and (d). Without deciding these issues, the Court notes, *obiter,* that disposition of these claims likely would require resolution of disputed material issues of fact, thereby precluding summary judgment.

**9.** Among other changes, the 1974 amendments augmented the previously enumerated commodities with the phrase: "all other goods and articles, . . . and all services, rights, and interests in which contracts for future delivery are presently or in the future dealt in." *See* Commodity Futures Trading Commission Act of 1974, Pub.L. No. 93–463, 88 Stat. 1389 (1974) (codified as amended at 7 U.S.C. § 2).

1974, Pub.L. No. 93–463, 88 Stat. 1389 (1974) (codified as amended at 7 U.S.C. § 2). The resulting definition of "commodity" is encyclopedic:

> The word "commodity" shall mean wheat, cotton, rice, corn, oats, barley, rye, flaxseed, grain sorghums, mill feeds, butter, eggs, Solanum tuberosum (Irish potatoes), wool, wool tops, fats and oils (including lard, tallow, cottonseed oil, peanut oil, soybean oil and all other fats and oils), cottonseed meal, cottonseed, peanuts, soybeans, soybean meal, livestock, livestock products, and frozen concentrated orange juice, and all other goods and articles, except onions as provided in section 13–1 of this title, and all services, rights, and interests in which contracts for future delivery are presently or in the future dealt in. . . .

7 U.S.C. § 2. Thus, virtually every conceivable good, article, right, or interest—except onions [10]—is potentially a commodity within the meaning of the CEA. Given this, it is undisputed and indisputable that foreign currency may be a commodity for purposes of the CEA.

Prior to enactment of the 1974 amendments, the Treasury Department became concerned that the proposed expansion of CFTC jurisdiction would adversely impact existing off-exchange markets for foreign currency and certain other financial instruments. Accordingly, the Department proposed an exemption for off-exchange transactions for future delivery in foreign currency and certain enumerated financial instruments. *See* S.Rep. No. 1131, 93rd Cong., 2d Sess. 49–51 (1974), U.S.Code Cong. & Admin.News 1974, p. 5843 (reprinting letter dated July 30, 1974, from the General Counsel of the Treasury to the Chairman of the Senate Committee on Agriculture and Forestry) (the "Treasury Letter"). The Treasury Letter listed several reasons for exempting off-exchange transactions for future delivery in foreign currency and certain other financial instruments. These reasons included (i) the existence of an already-regulated interbank market, (ii) the capacity of existing regulatory entities, namely the Comptroller of the Currency and the Federal Reserve, to regulate these transactions, (iii) lack of expertise of the CFTC in regulating complex banking functions, and (iv) the potential for "an adverse impact on the usefulness and efficiency of foreign exchange markets for traders and investors." Treasury Letter at 50, U.S.Code Cong. & Admin.News 1974, p. 5888.

With one exception not relevant here, Congress adopted the Treasury Department's proposed provision, enacting what is now commonly called the "Treasury Amendment." [11] *See* Commodity Futures Trading Commission Act of 1974, Pub.L. No. 93–463, 88 Stat. 1389 (1974) (codified as amended at 7 U.S.C. § 2). The Treasury Amendment states, in pertinent part: "Nothing in this chapter shall be deemed to govern or in any way be applicable to transactions in foreign currency . . ., unless such transactions involve the sale thereof for future delivery conducted on a board of trade." [12] 7 U.S.C. § 2. Although the transactions in this case involved sales for

---

**10.** Trading in onion futures is prohibited, 7 U.S.C. § 13–1(a). This provision brought tears to the eyes of at least some would-be onion futures traders. *See Chicago Mercantile Exchange v. Tieken,* 178 F.Supp. 779 (D.C.Ill.1959) (finding that a rational basis existed for Congress' conclusion that the speculative aspect of plaintiff's business in onion futures trading caused severe and unwarranted fluctuations in cash price of onions to the detriment of onion producers and the orderly flow of onions in interstate commerce, and accordingly holding that the statute was within the scope of congressional authority over interstate commerce and did not violate due process). Violating this statute is a misdemeanor punishable by a $5,000 fine. 7 U.S.C. § 13–1(b).

**11.** Congress deleted "puts and calls for securities" from the list of exempted transactions proposed by the Treasury Department. *Compare* 7 U.S.C. § 2 *with* Treasury Letter at 51.

**12.** The provision reads in full: "Nothing in this chapter shall be deemed to govern or in any way be applicable to transactions in foreign currency, security warrants, security rights, resales of installment loan contracts, repurchase options, government securities, or mortgages and mortgage purchase commitments, unless such transactions involve the sale thereof for future delivery conducted on a board of trade." 7 U.S.C. § 2.

future delivery, none was conducted on a board of trade. *Cf. Abrams v. Oppenheimer Government Securities, Inc.,* 589 F.Supp. 4, 7 (N.D.Ill.1983) (holding that the Treasury Amendment applied (and hence the CEA did not) to a contract for Government National Mortgage Association securities because it was not executed through an organized exchange). This being so, the disputed contracts are exempt from the CEA if they constitute "transactions in foreign currency." The central question presented then is the meaning and scope of this statutory phrase.

■ The touchstone of statutory interpretation is legislative intent as expressed in the statute's words. Thus, the well-settled starting point in the interpretive inquiry is the language of the statute itself. *See United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989); *Matala v. Consolidated Coal Co.,* 647 F.2d 427, 429 (4th Cir.1981) (stating the basic principles of statutory interpretation and applying them to § 203(b)(3) of the Federal Coal Mine Health and Safety Act of 1964). *See also Buckeye Production Credit Association v. Farm Credit Administration,* 787 F.Supp. 578, 588 n. 18 (E.D.Va.1992) (noting, in interpreting the Farm Credit Act, that "the best and most reliable indication of legislative intent is the statutory language itself"). Where the terms of a statute are unambiguous, the judicial inquiry is complete, except "in rare and exceptional circumstances." *See Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981) (quoting *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 187 n. 33, 98 S.Ct. 2279, 2298 n. 33, 57 L.Ed.2d 117 (1978)). *See also Ron Pair Enterprises,* 489 U.S. at 242, 109 S.Ct. at 1031 (plain meaning of legislation conclusive except in rare circumstances where literal application of a statute would lead to a result demonstrably at odds with congressional intent); *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982) (same); *In re Forfeiture Hearings as to Caplin & Drysdale, Chartered,* 837 F.2d 637, 641 (4th Cir.1988) (where a statute's language

is unambiguous, court's task of statutory construction ends unless enforcement of statutory language would contravene clearly expressed legislative intent); *Hoechst Aktiengesellschaft v. Quigg,* 917 F.2d 522, 526 (Fed.Cir.1990) (same). The plain meaning of a statute should be rejected only if there is substantial, unambiguous evidence supporting a contrary interpretation. *Matala,* 647 F.2d at 430. *See also Ford Motor Credit Co. v. Cenance,* 452 U.S. 155, 158 n. 3, 101 S.Ct. 2239, 2241 n. 3, 68 L.Ed.2d 744 (1981) ("Absent a clear indication of legislative intent to the contrary, the statutory language controls its construction."). For purposes of statutory interpretation, words of a statute are presumed to be used according to their ordinary meaning unless a different use is clearly indicated. *See Matala,* 647 F.2d at 429.

■ Applied here, these well-established principles of statutory interpretation compellingly point to the conclusion that the foreign currency contracts between Tauber and Salomon Forex are covered by the Treasury Amendment and thus excluded from regulation under the CEA. Simply put, in the CEA context, the phrase "transactions in foreign currency" plainly and unambiguously means any transaction, without limitation as to the participants involved, in which foreign currency is the commodity or subject matter, much as one would speak of transactions in flaxseed or wool tops. This clear statutory language gives rise to no lurking ambiguities. Given this, the judicial inquiry properly ceases here without resort to legislative history. *See Ron Pair Enterprises,* 489 U.S. at 242, 109 S.Ct. at 1031; *Griffin,* 458 U.S. at 571, 102 S.Ct. at 3250; *Rubin,* 449 U.S. at 430, 101 S.Ct. at 701; *Caplin & Drysdale,* 837 F.2d at 641; *Hoechst Aktiengesellschaft,* 917 F.2d at 526.

■ But in any event, the CEA's legislative history discloses no clear, unambiguous basis for concluding, as Tauber insists, that "transactions in foreign currency" contains a limitation on the transactional participants. Specifically, Tauber con-

tends that the Treasury Amendment exempts only those transactions between financial institutions, that is, the "interbank" market. Tauber argues, by selective references, that the legislative history reveals a congressional intent to restrict the scope of the exemption to the interbank market.[13] Tauber's position fails in two respects. First, the Treasury Amendment's plain language is not qualified in any respect to limit the covered participants. And legislative history may not be invoked to create an ambiguity where none otherwise exists. *See Railroad Comm'n of Wisconsin v. Chicago, Burlington and Quincy R.R. Co.*, 257 U.S. 563, 589, 42 S.Ct. 232, 238, 66 L.Ed. 371 (1922) (legislative history admissible to solve doubt, not create it); *Matala*, 647 F.2d at 430 ("The legislative history should never be used to create doubt if the language of a statute is plain on its face.") (citations omitted). Second, even if resorting to legislative history were appropriate, nothing contained therein indicates congressional intent to exclude *only* the interbank market. That Congress may have expressed concern about a particular circumstance, or reacted to Treasury Department concern about a particular circumstance, does not, by itself, demonstrate that Congress intended to address only that circumstance. Indeed, other portions of the legislative history suggest that the Treasury Department sought, and Congress intended, a broad exemption for off-exchange transactions for future delivery in foreign currency and certain enumerated financial instruments.[14] Taken as a whole, the legislative history reveals no clear and unambiguous expression of legislative intent to restrict the Treasury Amendment to the interbank market sufficient to warrant rejecting the plain, unambiguous, ordinary meaning of the statutory language. *See Ford Motor Credit Co.*, 452 U.S. at 158 n. 3, 101 S.Ct. at 2241 n. 3; *Matala*, 647 F.2d at 429–30. Especially instructive here is *Bank Brussels Lambert, S.A. v. Intermetals Corp.*, 779 F.Supp. 741, 751 (S.D.N.Y. 1991). Presented there with an essentially similar argument, that court reviewed legislative history and held that the Treasury Amendment is not limited to the interbank market in cases of spot trading of foreign currency. In so doing, the court concluded

**13.** *See* S.Rep. No. 1131, 93rd Cong., 2d Sess. 6 (1974), U.S.Code Cong. & Admin.News 1974, p. 5848 ("the *Committee* amendment provides that inter-bank trading of foreign currencies and specified financial instruments is not subject to Commission regulation") (emphasis in original); S.Conf.Rep. No. 1194, 93rd Cong., 2d Sess. 35 (1974) ("the *Senate* amendment provides that interbank trading of foreign currencies and specified financial instruments is not subject to Commission regulation") (emphasis in original); Treasury Letter at 49–51, U.S.Code Cong. & Admin.News 1974, pp. 5887–88 (discussing concern that CFTC jurisdiction not extend to the regulation of off-exchange transactions conducted by financial institutions and observing that "virtually all futures trading in foreign currencies in the United States is carried out through an informal network of banks and dealers.... The participants in this market are sophisticated and informed institutions, unlike the participants on *organized* exchanges....") (emphasis in original).

**14.** *See* S.Rep. No. 1131, 93rd Cong., 2d Sess. 23, 31 (1974), U.S.Code Cong. & Admin.News 197, pp. 5863, 5870 ("the Committee included an amendment to clarify that the provisions of the bill are not applicable to trading in foreign currencies and certain enumerated financial instruments unless such trading is conducted on a formally organized futures exchange. A great deal of the trading in foreign currency in the United States is carried out through an informal network or banks and tellers. The Committee believes that this market is more properly supervised by the bank regulatory agencies and that, therefore, regulation under this legislation is unnecessary." and "transactions in foreign currency, security warrants and rights, resales of installment loan contracts, repurchase options, government securities or mortgages and mortgage purchase commitments would not be subject to the Act unless they involve the sale thereof for future delivery conducted on a board of trade."); Treasury Letter at 49–50, 51, U.S.Code Cong. & Admin.News 1974, pp. 5887–89 ("The Department feels strongly that foreign currency futures trading, other than on organized exchanges, should not be regulated by the new agency;" "[w]here the need for regulation of transactions on other than organized exchanges does exist, this should be done through strengthening existing regulatory responsibilities not lodged in the Comptroller of the Currency and the Federal Reserve;" and "we strongly urge the Committee to amend the proposed legislation to make clear that its provisions would not be applicable to futures trading in foreign currencies or other financial transactions of the nature described above other than on organized exchanges.").

that "even if it is correct that Congress' *motivation* ... was to exempt interbank trading ... statutory history of this nature cannot be a substitute for express terms of the statute." (emphasis in original).[15]

Tauber also claims that the word "in" in the phrase "transactions in foreign currency" is ambiguous, at least with respect to the options contracts. Specifically, Tauber contends that the options contracts are not transactions "in" foreign currency. Rather, he asserts that they are transactions "in" rights to exercise options that merely "involve" foreign currency. While this may have some semantical appeal, once the option is exercised and the foreign currency traded or exchanged, the transaction, even by Tauber's lights, becomes one "in" foreign currency under the plain language of the Treasury Amendment. *Accord Commodity Futures Trading Comm'n v. American Board of Trade*, 803 F.2d 1242, 1248 (2nd Cir.1986) (permitting CFTC to enjoin public offerings of options to trade in foreign currency because "an option transaction giving the option holder the right to purchase foreign currency by a specified date and at a specified price does not become a 'transaction[ ] in' that currency unless and until the option is exercised.").[16] Here, the option contracts between Tauber and Salomon Forex were exercised when they matured in July and August of 1991. Thus, the exercised options contracts became transactions "in" foreign currency exempt from regulation under the CEA.

That the bulk of the contracts ultimately resulted in off-setting transactions, rather than actual receipt or delivery of foreign currency, does not alter this result. A set-off is, in legal effect, a delivery. *See Board of Trade v. Christie Grain & Stock Co.*, 198 U.S. 236, 248, 25 S.Ct. 637, 639, 49 L.Ed. 1031 (1905) (Holmes, J.). Under the

---

**15.** The CFTC statutory interpretation relied on by Tauber to establish the interbank market limitation is unpersuasive. There, the CFTC opined:

> Solely as a result of these expressions of concern by the [Treasury] Department [the Treasury Letter], and only for the purpose of addressing these specific concerns, Congress adopted, virtually without change, a provision recommended by the Treasury ... and which is generally referred to as the "Treasury Amendment." Insofar as foreign currency transactions were concerned, Congress expressed its intention that the Treasury Amendment be limited in its application to the interbank trading of such transactions supervised by the banking agencies. *See* S.Rep. No. 1131, 93rd Cong., 2d Sess. 6, 23, 31 (1974); S.Rep. No. 1194, 93rd Cong., 2d Sess. 35 (1974).

CFTC Statement at 31,122. The CFTC concluded that the Treasury Amendment does not apply to off-exchange foreign currency transactions involving members of the general public and solicited written comments concerning that nature and identity of the "sophisticated and informed institutions" comprising the interbank market. CFTC Statement at 31,125.

The CFTC's reasoning here is flawed. Congress may well have adopted the Treasury Amendment to address the specific concerns of the Treasury Department, but those concerns, as expressed in the Treasury Letter, were not limited to protecting the interbank market. Moreover, as noted above, the statutory language, on its face, does not express any intention to limit application of the Treasury Amendment to the interbank market. Nor can the legislative history cited by the CFTC reasonably be viewed as standing for the proposition that Congress intended to exempt only the interbank market. *See supra* notes 13, 14 and accompanying text. Simply put, the CFTC, in an apparent effort to maximize its jurisdictional reach, overreaches any reasonable interpretation attributable to the statutory language or legislative history.

This CFTC misinterpretation underscores the difficulty inherent in divining legislative intent from legislative history and reaffirms the sensible and well-settled principle that the plain language of a statute is conclusive absent substantial, unambiguous evidence supporting a contrary interpretation. *See Ford Motor Credit Co.*, 452 U.S. at 158 n. 3, 101 S.Ct. at 2241 n. 3; *Matala*, 647 F.2d at 430. As this Court has elsewhere noted, legislative history is frequently an unreliable indicator of legislative intent. *See Buckeye*, 787 F.Supp. at 588 n. 18. *See generally* Note, *Why Learned Hand Would Never Consult Legislative History Today*, 105 Harv.L.Rev. 1005 (1992).

**16.** *See also Board of Trade of City of Chicago v. S.E.C.*, 677 F.2d 1137, 1154 (7th Cir.), *vacated as moot*, 459 U.S. 1026, 103 S.Ct. 434, 74 L.Ed.2d 594 (1982) (finding, in the context of Government National Mortgage Association options, that "the options market may exist without any transactions in the commodity itself" and that a GNMA option is a transaction "in" government securities under the Treasury Amendment "[o]nly when the option holder exercises the option."). The reasons for the mootness of this opinion are unstated.

exercised options contracts, the parties had the obligation and capacity to deliver or accept delivery of the specified foreign currency at the set prices on the fixed dates. Put another way, upon exercising the option, the option holder had the immediate and absolute legal right to insist that the foreign currency be delivered. That the parties elected for commercial convenience, necessity, or other reasons to forgo actual delivery in favor of entering into new, separate, off-setting contracts is of no legal consequence with respect to the delivery obligation under the original contract. That original legal obligation to make or take delivery makes the exercised options, in sum and substance, "transactions in foreign currency." *Cf. In re Bybee,* 945 F.2d 309 (9th Cir.1991) (deferring, in the context of a dispute over the "cash forwards contracts" exemption, to the CFTC view that subsequent off-setting contracts do not impair contractual delivery obligations).[17]

■ In essence, the Court finds the Treasury Amendment is unmistakably clear and unambiguous on its face. All transactions in which foreign currency is the actual subject matter of an off-exchange contract for future delivery are exempt from the CEA. Further judicial inquiry is not required. To the extent that Congress may have intended a more restrictive exemption, it could easily have so stated. In any event, a search of the legislative history discloses no substantial, unambiguous evidence supporting a more restrictive interpretation. That Congress intended to accommodate the Treasury Department's concerns as expressed in the Treasury Letter is reasonably clear. That Congress intended to exclude off-exchange transactions in foreign currency for future delivery conducted by the interbank market

from CFTC regulation is pellucidly clear. Yet this purpose is not at odds with the plain and ordinary language of the statutory provision as enacted. Nothing in the legislative history suggests unambiguously that Congress intended to exempt *only* the interbank market. Nor does the result reached here frustrate any clearly expressed legislative intent. *See Ron Pair Enterprises,* 489 U.S. at 242, 109 S.Ct. at 1031; *Griffin,* 458 U.S. at 571, 102 S.Ct. at 3250; *Caplin & Drysdale,* 837 F.2d at 641; *Hoechst Aktiengesellschaft,* 917 F.2d at 526. Having determined, therefore, that the Treasury Amendment excludes the disputed contracts from the CEA, the Court need not, and does not, consider whether the contracts are also exempt under any other CEA provision.[18]

## CONCLUSION

In sum, the Court holds that the foreign currency futures and options contracts between Tauber and Salomon Forex are not subject to regulation under the CEA because they were off-exchange "transactions in foreign currency" for future delivery within the purview of the Treasury Amendment. Thus, nothing in the CEA bars their enforcement.

An appropriate Order has issued with respect to this holding and other matters addressed from the bench.

---

**17.** The CFTC language followed by the Ninth Circuit reads:

[that] while such [offset] agreements may extinguish a party's delivery obligation, they are separate, individually negotiated, new agreements, there is no obligation or arrangement to enter into such agreements, they are not provided for by the terms of the contracts as initially entered into, and any party that is in a position in a distribution chain that provides for the opportunity to book-out [offset]

with another party or parties in the chain is nevertheless entitled to require delivery of the commodity to be made through it, as required under the contracts.
*Statutory Interpretation Concerning Forward Transactions,* 55 Fed.Reg. 39188, 39189 (Sept. 15, 1990).

**18.** Also left for another day is the question of the appropriate measure of damages for CEA violations. *See* 7 U.S.C. § 25.