Opinion issued May 11, 2023



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-21-00586-CV

————————————

## GARZA PROPERTIES LLC, Appellant

## V.

## DURANGO PORTFOLIO, INC., HREAL COMPANY, LLC, DANNY HILAL, NIKOLA KNEZEVIC, AND JONATHAN R. CAMPBELL, Appellees

---

On Appeal from the 164th District Court
Harris County, Texas
Trial Court Case No. 2019-53269

---

## MEMORANDUM OPINION

Under Chapter 209 of the Property Code, "[t]he owner of property in a residential subdivision" or "a lienholder of record" has a statutory right to redeem the property from "any purchaser at a sale foreclosing a property owners'

association's assessment lien" by timely exercising the right and paying the prescribed redemption amount.[1] This appeal arises from an attempted redemption of property by Garza Properties LLC (Garza), a judgment lienholder against the property, from Durango Portfolio, Inc. (Durango) and HReal Company, LLC (HReal), the purchasers of the property at an assessment lien foreclosure sale. On summary judgment, the trial court rejected Garza's claims that it was a lienholder of record and obtained the former property owner's redemption right upon execution of its judgment lien; that its interest in the property was superior to Durango's and HReal's interest; and that Durango and HReal conspired with others—Danny Hilal, Nikola Knezevic, and Jonathan R. Campbell—to deprive Garza of its rights to the property.

On appeal, Garza contends the trial court's summary-judgment rulings are erroneous either because Garza established its redemption and superior title claims as a matter of law or fact issues preclude the judgment against it.

We reverse in part, affirm in part, and remand for further proceedings.

## Background

The property at issue, known as 2723 Blue Wind, Houston, Texas 77084 (Property), is in the Estates at Cullen Park subdivision and subject to the

---

[1] *See* TEX. PROP. CODE §§ 209.001–.017 (Texas Residential Property Owners Protection Act); *see also id.* § 209.011(b).

2

subdivision's Declaration of Restrictions, Covenants, and Conditions (Declaration). The Declaration, recorded in July 1996, establishes the Estates at Cullen Park Homeowners' Association (Association), and authorizes the Association to collect assessments from subdivision property owners. Relevant here, the Declaration creates "a charge and continuing lien" that secures the payment of assessments and related costs with the property against which the assessments are made.[2] Each property owner, "by [their] acceptance of a deed or other conveyance of the Lot," grants to the Association's board, as trustee for the Association's benefit, a deed of trust with a power of sale. Upon an owner's default in the payment of assessments, the trustee can sell the defaulting owner's property to the highest bidder at a nonjudicial foreclosure sale.

ALS Projects Group, Inc. (ALS) formerly owned the Property. In April 2014, Innovative Flooring Solutions, Inc. (Innovative Flooring) obtained a judgment against ALS. Innovative Flooring recorded an abstract of judgment in the Harris County records on June 13, 2014, thereby attaching a judgment lien to the Property.[3]

---

[2]     As provided in the Declaration, the lien securing assessment payments is superior to any subsequent "charges, liens, or encumbrances," except for: (1) bona fide mortgage or deed of trust liens for purchase money or home improvement loans; (2) ad valorem tax liens; and (3) such other liens as the Association's board, in its discretion, elects to voluntarily subordinate the Association's lien.

[3]     "When properly recorded and indexed, an abstract of judgment creates a judgment lien that is superior to the rights of subsequent purchasers and lien holders." *Noble Mortg. & Invs., LLC v. D & M Invs., LLC*, 340 S.W.3d 65, 81 (Tex. App.—Houston

Nine months later, Garza obtained an assignment of the judgment lien. Garza filed the assignment in the Harris County records on March 31, 2015.

ALS, still the Property's owner, failed to pay assessments as required by the Declaration. In May 2018, the Association applied to a Harris County district court for an order authorizing a nonjudicial foreclose of its assessment lien against the Property. In support of its application, the Association submitted the affidavit of its property manager stating that ALS had defaulted on three scheduled payments and owed $7,053.08 in unpaid assessments and related costs. The district court authorized the Association to proceed with a foreclosure sale.

The Property was sold to Durango and HReal at the foreclosure sale on February 5, 2019.[4] The trustee's deed transferring the Property to Durango and HReal was recorded on February 26, 2019, and states:

> This conveyance is expressly made and accepted subject to the redemption right of Chapter 209 of the Texas Property Code, as well as all valid and subsisting easements, liens, restrictions, reservations, covenants, conditions and royalty and mineral interests relating to the Property to the extent that the same are valid and enforceable against the Property as the same are shown by instruments filed for record in the Office of the County Clerk of Harris County, Texas, and to the extent that the same are valid and enforceable and have not been cleared from the record as a result of the foreclosure described herein.

---

[1st Dist.] 2011, no pet.) (quoting *Wilson v. Dvorak*, 228 S.W.3d 228, 233–34 (Tex. App.—San Antonio 2007, pet. denied); *see also* TEX. PROP. CODE § 52.001.

[4] The trustee's deed conveying the Property to Durango and HReal states a purchase price of $10,201.00, which the deed recited was "the sum then owing by [ALS] to [the Association]."

Meanwhile, in the week before the foreclosure sale, Garza acted to enforce its judgment lien against ALS. Garza obtained a writ of execution from the county clerk on January 30, 2019. The constable's return recited that the constable received the writ on February 25, levied an execution on the Property on February 27, and later sold "all of the right, title, and interest owned by [ALS] in the [P]roperty" to Garza as the highest bidder at a constable's sale conducted on April 2, two months after the assessment lien was foreclosed. The constable's deed conveying the Property to Garza was recorded on April 26.

On May 13, 2019, Garza tried to redeem the Property. In a letter addressed to the Association, Durango, and HReal, Garza invoked the statutory right of redemption in Chapter 209 of the Property Code and requested the redemption amount. *See* TEX. PROP. CODE § 209.011(b) ("The owner of property in a residential subdivision or a lienholder of record may redeem the property from any purchaser at a sale foreclosing a property owners' association's assessment lien not later than the 180th day after the date the association mails written notice of the sale to the owner and the lienholder under Section 209.010."); *id.* § 209.011(e) (to redeem property bought at foreclosure sale by person other than property owner's association, owner or lienholder must pay association all amounts due plus other costs and must pay purchaser purchase price plus other costs). Durango and HReal

responded that Garza had no right to redeem the Property because Garza was neither an owner of the Property nor a lienholder of record, as required by the statute.

On June 17, 2019, Garza tendered a redemption payment to Durango and HReal for the purchase price listed on the trustee's deed and expressed its willingness to pay any extra amount required. Durango and HReal again refused to recognize Garza's right of redemption and returned the tendered payment.

After the second rejection of its redemption request, Garza sued Durango and HReal.[5] Garza alleged that its constable's deed conveyed superior title to the Property and sought to remove the cloud on title created by the trustee's deed or, alternatively, to redeem the Property from Durango and HReal. Garza also named three other defendants: Danny Hilal (of Durango), Nikola Knezevic (of HReal), and Jonathan R. Campbell (whom Garza alleged had purchased foreclosed properties with HReal in the past). Garza alleged that these individuals conspired with Durango and HReal to chill bidding at the assessment lien foreclosure sale and to prevent the Property from being redeemed.

The defendants answered, and the parties filed competing motions for summary judgment. The defendants jointly moved for a final, traditional summary judgment on Garza's claim of superior title to the Property. They also argued that

---

[5] Garza also sued the Association but later nonsuited its claims against the Association.

Garza was not an "owner" entitled to redeem the Property under Chapter 209 because Garza did not hold record title to the Property before Durango and HReal purchased it. And although Garza held an assignment of a recorded judgment lien, Garza could not redeem the Property as a "lienholder of record" because that statutory term refers only to deed of trust lienholders. Finally, while Garza did not specifically plead a conspiracy claim, the defendants' summary-judgment motion addressed the factual allegations of a conspiracy "in the interest of completely disposing of [Garza's] claims." They argued that any conspiracy claim failed as a matter of law because Garza had not shown that they acted to chill bidding at the assessment lien foreclosure sale and because Garza could not complain about a deprivation of a redemption right it did not possess.

Garza argued in its traditional motion for a partial summary judgment that it held superior title to the Property as a matter law because its judgment lien against the Property was first in time and thus senior to the Association's foreclosed assessment lien. In addition, Garza identified two sources of its claimed redemption right. First, Garza claimed a right to redeem the Property as a "lienholder of record" because it held a judgment lien against the Property. Second, Garza claimed that it had acquired ALS's right to redeem the Property as the former owner. On this second claim, Garza argued that ALS's right to redeem the Property was "an interest in real property that is transferrable by a voluntary or involuntary sale" and that the

constable's deed conveying "all of the right, title, and interest owned by [ALS] in the [P]roperty" included ALS's right to redeem the Property after foreclosure. Garza also complained of unspecified "irregularities" in the assessment lien foreclosure that "caused or contributed to a grossly inadequate sales price at the foreclosure sale."

After considering the parties' competing arguments and evidence, the trial court granted the defendants' joint motion for summary judgment and denied Garza's motion.[6] The trial court ordered that Garza take nothing on its claims against the defendants.

## Standards of Review

We review a trial court's grant of summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). When reviewing a summary judgment, we must (1) take as true all evidence favorable to the nonmovant and (2) indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). If a trial court grants summary judgment without specifying the grounds, we must uphold the trial court's judgment if any one of the grounds asserted in the motion is meritorious.

---

[6]    The trial court excluded certain of Garza's exhibits from the summary-judgment evidence. Although Garza complains on appeal that the trial court erred by sustaining Durango and HReal's objections to the excluded exhibits, we do not reach the issue because it is unnecessary to do so given our disposition of Garza's other issues. *See* TEX. R. APP. P. 47.1.

8

*FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000); *Beverick v. Koch Power, Inc.*, 186 S.W.3d 145, 148 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

Relevant here, to obtain a traditional summary judgment, the movant has the burden to show that no genuine issue of material fact exists and that the trial court should grant judgment as a matter of law. TEX. R. CIV. P. 166a(c); *KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999). When both parties move for summary judgment, each party bears the burden of establishing its entitlement to judgment as a matter of law. *City of Garland v. Dallas Morning News*, 22 S.W.3d 351, 356 (Tex. 2000). A plaintiff moving for traditional summary judgment must conclusively establish each element of its cause of action. *Rhône-Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999); *Anglo-Dutch Petroleum Int'l, Inc. v. Haskell*, 193 S.W.3d 87, 95 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). A defendant moving for traditional summary judgment must negate at least one essential element of the plaintiff's cause of action or conclusively establish each element of an affirmative defense. *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997). When the trial court grants one motion and denies the other, we review the summary-judgment evidence presented by both parties and determine all questions presented. *City of Garland*, 22 S.W.3d at 356. We must render the judgment the trial court should have rendered or reverse and remand if

neither party has met its summary-judgment burden. *Id.*; *Al's Formal Wear of Houston, Inc. v. Sun*, 869 S.W.2d 442, 444 (Tex. App.—Houston [1st Dist.] 1993, writ denied).

The summary-judgment rulings here involve questions of statutory construction, which we also review de novo. *Loaisiga v. Cerda*, 379 S.W.3d 248, 254–55 (Tex. 2012). When courts construe statutes, they should start with the text because it is the best indication of the Legislature's intent. *See Fresh Coat, Inc. v. K–2, Inc.*, 318 S.W.3d 893, 901 (Tex. 2010). "When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992) (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)). A court should interpret a statute by reference to its language alone when it can do so. *See Molinet v. Kimbrell*, 356 S.W.3d 407, 411 (Tex. 2011). But courts are not confined to isolated statutory words or phrases; instead, they review the entire act to determine legislative intent. *Meritor Auto., Inc. v. Ruan Leasing Co.*, 44 S.W.3d 86, 90 (Tex. 2001); *City of Hous. v. Hildebrandt*, 265 S.W.3d 22, 25 (Tex. App.—Houston [1st Dist.] 2008, pet. denied).

**Trespass to Try Title**

Garza contends the trial court erred by denying its motion for summary judgment on trespass to try title and instead granting Durango and HReal's motion

10

seeking dismissal of that claim. According to Garza, the record establishes its superior title as a matter of law.

A trespass to try title action is a procedure by which claims to title may be adjudicated. *See Jinkins v. Jinkins*, 522 S.W.3d 771, 786 (Tex. App.—Houston [1st Dist.] 2017, no pet.); *see also* TEX. PROP. CODE § 22.001(a) ("A trespass to try title action is the method of determining title to lands, tenements, or other real property."). The plaintiff in a trespass to try title action must recover, if at all, on the strength of its own title and may not rely on the weakness of the defendant's title. *Rogers v. Ricane Enters., Inc.*, 884 S.W.2d 763, 768 (Tex. 1994); *Ellis v. Buentello*, No. 01-12-00098-CV, 2012 WL 3528009, at *4 (Tex. App.—Houston [1st Dist.] Aug. 16, 2012, no pet.) (mem. op.). The plaintiff has the burden to establish superior title by showing it has (1) title emanating from the sovereignty of the soil, (2) superior title from a common source, (3) title by adverse possession, or (4) title by prior possession coupled with proof that possession has not been abandoned. *Ellis*, 2012 WL 3528009, at *4.

Garza sought to prove superior title from a common source—ALS—based on its assertion of lien superiority. Garza asserts that its judgment lien attached to the Property on June 13, 2014, when Innovative Flooring filed the abstract of judgment against ALS in the Harris County real property records, while the Association's

11

assessment lien could not have attached before January 1, 2016, when ALS first defaulted on its assessment obligation. Garza asserts:

> Because the assessments are annual and come into existence [under the Declaration] on January 1 of each calendar year and there were three remaining unpaid annual assessments due as of April 5, 2018, a separate lien priority date was created on January 1, 2016, January 1, 2017, and January 1, 2018. In this case the January 1, 2016 annual assessment was the earliest date that the [Association's] assessment lien's priority was established.[7]

According to Garza's timeline, its judgment lien was senior to the Association's assessment lien because the judgment lien was first in time. Based on this timeline, Garza contends that the foreclosure of the junior assessment lien did not impair its senior judgment lien and so it obtained superior title through the constable's sale executing the senior judgment lien.[8]

---

[7] There is no conclusive evidence in the record establishing when ALS defaulted on assessments. The affidavit of the Association's property manager states only that ALS was "in default of the [d]eed [r]estrictions" and that, "[a]s of April 5, 2018, the number of scheduled payments remaining unpaid by [ALS] [was] [three]." The affidavit does not specify the dates of the unpaid assessments or indicate when the "scheduled payments" were due. Garza interprets the affidavit to mean that ALS defaulted on the three annual assessments immediately preceding the Association's application for an order authorizing nonjudicial foreclosure of its assessment lien— the annual assessments for 2016, 2017, and 2018. We need not determine whether Garza's reading of the affidavit is correct because there is no dispute that ALS defaulted on assessments *after* Garza's judgment lien attached to the Property. Thus, Garza's contention of lien superiority can be reviewed without regard for the specific date of ALS's default.

[8] We understand Garza's argument to rest on the common law principle that "the successful bidder at a junior lien foreclosure takes title subject to the prior liens." *See, e.g.*, *Conversion Props., LLC v. Kessler*, 994 S.W.2d 810, 813 (Tex. App.— Dallas 1999, pet. denied); *see also DiSanti v. Wachovia Bank, N.A.*, No. 2-08-330-CV, 2009 WL 1372970, at *3–4 (Tex. App.—Fort Worth May 14, 2009,

12

For their part, Durango and HReal do not dispute that the judgment lien attached to the Property on June 13, 2014. But they disagree with Garza on the judgment lien's priority. They respond that the assessment lien was the senior lien because it was created by the filing of the Declaration in 1996 and attached continuously thereafter. According to Durango and HReal, the foreclosure of the senior assessment lien extinguished Garza's junior judgment lien.

Considering the parties' disagreement and the trial court's ruling, our primary inquiry is whether the summary-judgment record establishes when the assessment lien attached as a matter of law. Generally, different liens upon the same property have priority according to the time of their creation. *See AMC Mortg. Servs., Inc. v. Watts*, 260 S.W.3d 582, 585 (Tex. App.—Dallas 2008, no pet.); *World Help v. Leisure Lifestyles, Inc.*, 977 S.W.2d 662, 668 (Tex. App.—Fort Worth 1998, pet. denied). This rule is known as "first in time is first in right." *Windham v. Citizens Nat'l Bank*, 105 S.W.2d 348, 351 (Tex. App.—Austin 1937, writ dism'd); *see also Tanya L. McCabe Trust v. Ranger Energy LLC*, 531 S.W.3d 783, 798 (Tex. App.— Houston [1st Dist.] 2016, pet. denied).

In support of their contention that the Association's assessment lien was senior, Durango and HReal rely on the Texas Supreme Court's opinion in *Inwood*

---

pet. denied) (mem. op.) (holding purchaser at homeowners' association foreclosure sale took property subject to superior vendor's lien).

*N. Homeowners' Ass'n, Inc. v. Harris*, 736 S.W.2d 632 (Tex. 1987). There, the issue of lien priority arose in the context of a conflict between an association's declaration that created assessment liens and a homeowner's homestead rights in the same property. *Id.* at 635–36. The Court held that the association's interest was superior to the homeowners' homestead rights because the association's assessment lien attached when the association's original declaration was filed, before the homeowners took title, and because the assessment lien ran with the land. *Id.* at 636–35. In determining when the assessment lien attached, the Court looked to the parties' agreement in the original declaration, which created continuing assessment liens on the date of the declaration. *See id.* at 634–35. Though the declaration text is not quoted in *Inwood*, the Court stated:

> Under Article IV of the declaration, each person receiving a deed for a lot in the subdivision "is deemed to covenant and agree to pay the Association the following: (a) annual assessment or charges; and (b) special assessments for capital improvements." These assessments, plus interest and costs of collection, were designated to be "a charge on the land and shall be secured by a continuing Vendor's Lien upon the Lot against which such assessments or charges are made."

*Id.* at 633.

In contrast, Garza supports its contention that the judgment lien is senior because the assessment did not attach until ALS defaulted on assessments with citation to *Red Rock Properties 2005, Ltd. v. Chase Home Finance, L.L.C.*, No. 14-08-00352-CV, 2009 WL 1795037, at *4–5 (Tex. App.—Houston [14th Dist.]

14

June 25, 2009, no pet.) (mem. op.). There, our sister court in Houston distinguished *Inwood* and held that a condominium association's declaration created an assessment lien only upon default of the monthly assessments, not on the declaration's filing date. *See id.* at \*4–5. The *Red Rock* declaration provided:

> All common *monthly* assessments and special assessments *assessed but unpaid* by a Unit Owner for its share of Common Expenses chargeable to its respective Condominium Unit, including interest thereon at ten percent (10%) per annum, plus any attorney's fees incurred by the Association in order to enforce compliance by any Owner with the terms of this Declaration, the By–Laws, Articles of Incorporation, or Rules and Regulations of the Association, *shall constitute a lien* on such Unit superior (prior) to all other liens and encumbrances . . . .
>
> \* \* \*
>
> . . . *Such lien for the Common Expenses shall attach from the date of the failure of payment of the assessment* . . . .

*Id.* at \*4 (emphasis in original). From this, the court concluded that the parties' "clear and explicit intention . . . [was] that the act of nonpayment gives rise to an assessment lien; nothing . . . in the [d]eclaration suggest[s] that an assessment lien relates back to a previously recorded document or the date on which the [d]eclaration was signed or recorded." *Id.*

As in *Inwood* and *Red Rock,* we look to the Association's Declaration to determine when the assessment lien attached here. Section 4.01 of the Declaration— "Creation of the Lien and Personal Obligation for Assessments"—provides in pertinent part:

15

The regular annual assessments, special assessments, and default assessments, together with such interest thereon and costs of collection thereof as hereinafter provided . . . *shall be a charge and continuing lien upon each Lot against which each such Assessment is made*. Each such Assessment, together with such interest thereon and costs of collection thereof, as hereinafter provided, shall also be the continuing personal obligation of the person who was the Owner of such Lot at the time when the Assessment became due. The annual assessments shall be payable as provided in this Article IV.

(Emphasis added.)

The clear intent expressed in section 4.01 is for the assessment lien to attach on the date of the Declaration and continue with the land, as in *Inwood*. Beyond the emphasized language stating plainly that assessments "shall be a charge and continuing lien upon each Lot," we are persuaded of this meaning by the alternative timing mechanism supplied in the next sentence for the personal obligation created by assessments. That sentence provides that assessments will be "the continuing personal obligation of the person who was the owner at the time when the Assessment became due," and thus distinguishes between obligations that arise when assessments are due and those that run with the land. Garza's assertion that a new lien is created each year when assessments become due conflates the creation of the assessment lien with the existence of a delinquency and the way the Association may enforce the lien in the event of a delinquency.

In sum, we conclude that, under section 4.01, the filing of the Declaration in 1996 gave rise to assessment liens that run with the land, as in *Inwood*. Thus, the

summary-judgment record conclusively establishes that the Association's first-in-time assessment lien was senior to Garza's later-in-time judgment lien. And Garza's claim of superior title premised on the seniority of its judgment lien fails as a matter of law. We therefore hold that the trial court did not err by denying Garza's summary-judgment motion on its trespass to trial title action or by dismissing that action on Durango and HReal's motion.

**Right of Redemption**

We next consider Garza's contention that the trial court erred by concluding that it did not have a redeem the Property from Durango and HReal.

Garza seeks to exercise the statutory right of redemption in Chapter 209 of the Property Code. *See* TEX. PROP. CODE §§ 209.001–.017. Chapter 209 includes certain rights and protections for properties subject to mandatory property owners' associations, including requirements for notice and a right to redeem property after a foreclosure sale. *See id.* §§ 209.010, .011. Relevant here,

> A property owners' association that conducts a foreclosure sale of an owner's lot must send to the lot owner and to each lienholder of record, not later than the 30th day after the date of the foreclosure sale, a written notice stating the date and time the sale occurred and informing the lot owner and each lienholder of record of the right of the lot owner and lienholder to redeem the property under Section 209.011.

*See id.* § 209.010. Under section 209.011, "[t]he owner of property in a residential subdivision or a lienholder of record may redeem the property from any purchaser at a sale foreclosing a property owners' association's assessment lien" within 180

17

days after the section 209.010 notice by paying the redemption amount. *Id.* § 209.011(b), (e).

Because a party's right to redeem a property under Chapter 209 depends on the interest the party held with respect to the property, we must determine whether Garza may be considered the Property's owner or a lienholder of record. "It has long been the practice in Texas to liberally construe redemption statutes in favor of redemption." *Laguan v. Lloyd*, 493 S.W.3d 720, 723 (Tex. App.—Houston [1st Dist.] 2016, no pet.); *see also Khyber Holdings, LLC v. HSBC Bank USA, Nat'l Ass'n*, No. 05-12-01212-CV, 2014 WL 1018195, at *3 (Tex. App.—Dallas Mar. 15, 2014, no pet.) (mem. op.) ("We construe redemption statutes liberally in favor of the right of redemption."); *Gonzalez v. Razi*, 338 S.W.3d 167, 170 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) ("[I]t has been the practice in Texas since at least 1909 to liberally construe redemption statutes in favor of redemption.").

Garza argues that it may be considered the Property's owner under Chapter 209 because it "succeeded to [ALS's] statutory right of redemption." According to Garza, "[t]he right of redemption is not personal to the owner at the time of the [assessment lien foreclosure] sale." Instead, it acquired ALS's redemption right when it acquired "all of the right, title, and interest owned by [ALS] in the [P]roperty" at the constable's sale and then tried to exercise that right during the redemption period. In other words, Garza claims to have stepped into ALS's shoes

18

for the purpose of redeeming the Property, and its ownership contention depends on the transferability of ALS's redemption right.

In support, Garza cites *St. Andrews Investment Co. v. Valdez*, a case determining who may be considered a property's "owner" for the purpose of redeeming property sold at a tax sale. *See* No. 14-19-00781-CV, 2021 WL 330122, at *1, 3–4 (Tex. App.—Houston [14th Dist.] Feb. 2, 2021, pet. denied) (mem. op.). In *St. Andrews*, a taxing authority sued Raymond Sturgeon for delinquent taxes owed on Sturgeon's homestead. *St. Andrews*, 2021 WL 330122, at *1. Valdez purchased the property at a tax foreclosure sale. *Id.* Under section 34.21 of the Texas Tax Code, the owner of real property used as a homestead that is sold at a tax sale to a purchaser other than a taxing unit may redeem the property on or before the second anniversary of the date on which the purchaser's deed is filed for record by paying the purchaser a prescribed amount of money. TEX. TAX CODE § 34.21(a). But Sturgeon died during the two-year redemption period, and his heirs transferred their property redemption rights to St. Andrews Investment Company, which promptly exercised the right of redemption. *St. Andrews*, 2021 WL 330122, at *1. Valdez sued St. Andrews for declaratory judgment and moved for summary judgment, asserting that St. Andrews was not the property "owner" and for that reason lacked the right to redeem the property. *Id.* The trial court granted Valdez's motion, and the appellate court reversed. *Id.* at *4–5.

19

As noted by the appellate court, the Tax Code does not define an "owner" for the purpose of exercising the right to redeem property. *Compare* TEX. TAX CODE § 34.21, *with* TEX. PROP. CODE § 209.002(6). So the court looked to the word's ordinary meaning and concluded that ownership means "'[t]he bundle of rights allowing one to use, manage, and enjoy property, including the right to convey it to others. . . . Ownership rights are general, permanent, and heritable.'" *St. Andrews*, 2021 WL 330122, at *4 (quoting *Owner, Ownership*, BLACK'S LAW DICTIONARY (11th ed. 2019)). Applying this definition, the court observed there was no dispute that Sturgeon owned property when it was sold at the tax sale and that he had two years after Valdez's tax sale deed was recorded to redeem the property under section 34.21. *Id.*; *see also* TEX. TAX CODE § 34.21(a). When Sturgeon died within the two-year period, his right of redemption passed to his heirs. *St. Andrews*, 2021 WL 330122, at *4. On the heirs' assignment of their redemption right, the court held:

> The right of redemption was not restricted to the heirs alone, and they were free to pass the right to their assign or their grantee, which they did, also within the two-year redemption period. . . . By virtue of the [heirs'] assignment, St. Andrews stepped into the heirs' shoes and acquired their right of redemption.

*Id.* at *4–5 (internal citations omitted).

By its holding, the court rejected Valdez's contention that only a person who "had title to the property" on certain operative dates set out in the statute may be considered the "owner" entitled to redeem the property. *Id.* at *4–5. The court stated:

20

"The right of redemption 'is not personal to the owner at the time of the tax sale.'" *Id.* at *3 (quoting *McGuire v. Bond*, 271 S.W.2d 508, 511 (Tex. App.—El Paso 1954, writ ref'd n.r.e.). It is actually "a 'statutory privilege,' which may be passed from the owner to an heir by deed or will." *Id.* (quoting *McGuire*, 271 S.W.3d at 511). Even though St. Andrews did not hold title to the property on the operative dates, it obtained a valid right of redemption from the heirs of the person who did. *Id.* at *4–5. Thus, the summary-judgment record did not conclusively establish that St. Andrews had no right to redeem the property. *Id.* at *5.

Although the redemption statute at issue in *St. Andrews* is different from the redemption statute here, we find our sister court's discussion instructive. Unlike in the Tax Code, "owner" is a defined term in Chapter 209. *See* TEX. PROP. CODE § 209.002(6). It means "a person who holds record title to property in a residential subdivision and includes the personal representative of a person who holds record title to property in a residential subdivision." *Id.* Where, as here, the Legislature defines a statutory term, the courts must honor that meaning. *See* TEX. GOV'T CODE § 311.011(b) ("Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly.").

There is no dispute that ALS, like Sturgeon, was the Property's owner at the time of the assessment lien foreclosure sale. There is also no dispute that as the

21

Property's owner, ALS had the right under Chapter 209 to redeem the Property from Durango and HReal during the redemption period. *See* TEX. PROP. CODE § 209.011(b). The trustee's deed conveying the Property to Durango and HReal expressly states that it is subject to the right of redemption in Chapter 209. And finally, there is no dispute that Garza obtained the constable's deed conveying "all of the right, title, and interest owned by [ALS] in the [P]roperty" when ALS still had the right to redeem the Property. The question then is whether "all of the right, title, and interest owned by [ALS] in the [P]roperty" included ALS's right of redemption. We conclude that it did.

Without attempting to distinguish *St. Andrews* or citing any authority, Durango and HReal assert that the right to redeem the Property is a "personal right" of the prior owner at the time of the assessment lien foreclosure sale. But no statutory language compels that conclusion. While the definition of an owner is limited to record title holders and the personal representatives of record title holders, *see* TEX. PROP. CODE § 209.002(6), it does not prohibit an owner from passing its right to redeem property to another. Nor does any other provision of Chapter 209.[9] *See id.*

---

[9] On this point, we note section 34.21 of the Tax Code—the redemption statute at issue in *St. Andrews*—has been amended to expressly provide that redemption rights are not transferrable. The change in law did not affect a transfer of a property owner's right of redemption that occurred before the effective date of the legislative act, which was June 14, 2019. *See* Act of May 22, 2019, 86th Leg., R.S., ch. 1345, §§ 2–3. Because the transfer in *St. Andrews* occurred in 2018, the change in law did

§§ 209.001–.017. We therefore conclude that because the constable's deed conveyed to Garza all of ALS's rights, title, and interest in the Property, Garza stepped into ALS's shoes and acquired its right of redemption.

We hold the trial court erred in granting summary judgment against Garza on its claim seeking to redeem the Property. Durango and HReal did not conclusively establish that Garza could not redeem the Property because it was not considered an owner under the statute.[10] Although Garza filed a cross-motion for summary judgment seeking a determination that it redeemed the Property as a matter of law, we do not make that holding because Garza's compliance with the redemption statute's other requirements is not conclusively established. *See, e.g.*, TEX. PROP. CODE § 209.011(e).

## Conspiracy

Finally, we consider Garza's contention that the trial court erred by granting summary judgment dismissing its claim that Durango and HReal conspired with Hilal, Knezevic, and Campbell to chill bidding at the assessment lien foreclosure sale and deprive Garza of its right to redeem the Property.

---

not apply. Chapter 209 does not contain any similar prohibition. *See* TEX. PROP. CODE § 209.011.

[10] We do not decide whether Garza is also entitled to redeem the Property as a "lienholder of record" because it is unnecessary to do so. *See* TEX. R. APP. P. 47.1.

23

The defendants jointly moved for summary judgment on Garza's conspiracy claim on two grounds: (1) Garza should not be heard to complain about any irregularities in the assessment lien foreclosure because it did not have a right to redeem the Property under Chapter 209, and (2) Garza had not established that the price Durango and HReal paid at the assessment lien foreclosure sale resulted from bid chilling. Neither ground sustains the trial court's summary judgment.

Our holding that Garza stepped into ALS's shoes and acquired its right of redemption precludes summary judgment on the first ground. As to the second ground, we note the defendants moved for a traditional summary judgment, which imposed on them the requirement to conclusively negate an element of Garza's cause of action before the burden shifted to Garza to raise a fact issue.[11] *See generally Rollins v. Pressler*, 623 S.W.3d 918, 924–25 (Tex. App.—Houston [1st Dist.] 2021, pet. denied) (setting out well-established standard for traditional summary judgment and recognizing that plaintiff does not have burden to come forward with evidence raising fact issue on challenged claim before defendant carries its burden to conclusively disprove at least one element of claim). An argument that Garza failed

---

[11]    The defendants did not argue below or on appeal that their summary judgment motion should be construed as a hybrid traditional and no-evidence motion. They acknowledge the motion as a traditional one.

to show a conspiracy among the defendants to chill the bidding at the assessment lien foreclosure sale was not a proper basis for a traditional summary judgment.

Accordingly, the defendants have not presented a valid ground for summary judgment on Garza's conspiracy claim, and the trial court erred by granting their motion on that claim.[12] We express no opinion on the merits of Garza's conspiracy claim. Nor do we hold that Garza is entitled to judgment as a matter of law on the claim, because Garza did not file a cross-motion seeking that relief.

## Conclusion

For these reasons, we reverse the trial court's summary judgment on Garza's claim seeking to redeem the Property and for conspiracy, and we remand for further proceedings on those claims only. We affirm the remainder of the trial court's summary judgment.


Sarah Beth Landau
Justice

Panel consists of Justices Kelly, Landau, and Farris.

---

[12]  We need not reach Garza's complaint that the trial court erred by excluding certain exhibits from the summary judgment evidence given our holding that the summary judgment burden did not shift to Garza. *See* TEX. R. APP. P. 47.1.

25